## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:18-cv-61631-KMM

| | |
|---|---|
| THOMAS W. LUCZAK, Individually and On Behalf of All Others Similarly Situated, | **(JURY TRIAL DEMANDED)** |
| Plaintiff, | |
| vs. | |
| NATIONAL BEVERAGE CORP., NICK A. CAPORELLA, and GEORGE R. BRACKEN, | |
| Defendants. | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiff Thomas W. Luczak ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding National Beverage Corp. ("National Beverage" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired National Beverage securities between

1

July 17, 2014 through October 30, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      National Beverage, through its subsidiaries, develops, produces, markets, and sells a portfolio of flavored beverage products in North America and internationally. The Company offers beverages to the active and health-conscious consumers, including sparkling waters under the LaCroix, LaCroix Cúrate, LaCroix NiCola, and Shasta Sparkling Water brand names.  It serves retailers, as well as various up-and-down-the-street accounts through the take-home, convenience, and food-service distribution channels.  The Company sells and markets its products through an internal sales force, as well as specialized broker networks.

3.      National Beverage was founded in 1985 and is based in Fort Lauderdale, Florida. National Beverage is a subsidiary of IBS Partners, Ltd.  Its stock trades on the NASDAQ under the ticker symbol "FIZZ".  National Beverage is a family-controlled corporation with Defendant Caporella controlling 73.5% of the common stock.  Analysts have continually criticized the Company's "opaque" presentment of its financial information.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) National Beverage's sales claims and the supposed underlying "proprietary techniques" lacked a verifiable basis and were not important metrics used to determine sales; (ii) LaCroix was not 100% natural as the Company had claimed; (iii) Natural Beverage financial statements failed to comply with GAAP, primarily due to failure to make sufficient disclosures relating to the concentration of the

Company's revenues in LaCroix; (iv) National Beverage's Chairman and CEO, Defendant Caporella, engaged in a pattern of sexual misconduct between 2014 and 2016; and (v) as a result, National Beverage's public statements were materially false and misleading at all relevant times.

5.      In May and June 2017, Defendants touted various sales metrics to the investing public, including "Velocity Per Outlet" ("VPO") and "Velocity Per Capital" ("VPC"), claiming that these metrics are an important measure of growth and sales. In fact, these metrics were not useful in measuring sales or growth, despite Defendants representations to the contrary.

6.      Defendants also touted their largest growing product, LaCroix, as being all "natural" and as such, having an edge over sparkling water competition.  However, on October 1, 2018, a consumer complaint was filed against National Beverage alleging that LaCroix is not 100% natural. Despite Defendants' statements to the public, the impact of LaCroix not being 100% natural caused consumers to consume less, causing a decline in sales.

7.      In addition, throughout the Class Period, Defendants violated Generally Accepted Accounting Principles ("GAAP") by failing to disclose revenue and sales specifically from its largest growth generator, LaCroix, causing confusion amongst the analysts and the market as to what LaCroix revenue and growth was.

8.      On December 7, 2017, National Beverage issued a press release announcing its financial and operating results for the period ended October 28, 2017.  Notwithstanding the Company's representations in its May 2017 press releases with respect to "creat[ing] growth never before thought possible," analyst Laurent Grandet of Credit Suisse assigned an "underperform" rating to the Company's stock.  Grandet noted that National Beverage's business was driven "almost entirely" by the success of its LaCroix sparkling water brand, the growth trajectory of which was in fact slowing.  That same day, Maxim analyst Anthony Vendetti reiterated a "sell"

recommendation for National Beverage stock, noting that its "numerous weak brands and opaque financial reporting" made its sale "highly unlikely."

9.    On this news, National Beverage's share price fell $11.91, or 10.56%, to close at $100.84 on December 8, 2017.

10.    The Company's disclosures regarding the VPO and VPC metrics also caught the attention of the Securities and Exchange Commission ("SEC").  On January 26, 2018, the SEC issued a letter to the Company asking for more information regarding the performance metrics. The Company refused to provide the SEC with additional data, such that on March 26, 2018 a second letter was issued by the SEC to the Company asking for more information regarding the VPO metrics.  The market had now learned that the Company was failing to cooperate with the SEC and refused to give it the information requested regarding sales.

11.    Upon this news, the stock had a statistically significant decline of $1.96 from a previous close of $87.65.

12.    Then, on June 26, 2018, the *Wall Street Journal* published an article entitled "The SEC Has Had Its Own Questions About LaCroix", reporting that National Beverage had "declined to provide" the SEC "with requested sales figures to clarify [National Beverage's] sales claims", following a letter request from the SEC in January 2018.  The market had now learned that the claims about the metrics were not important despite Defendants' representation to investors that these metrics were material to how investors should look at the Company.

13.    On this news, National Beverage's share price fell $9.75, or 8.87% on unusually high trading volume, to close at $100.19 on June 27, 2018.

14.    On July 3, 2018, the *Wall Street Journal* published an article entitled "Billionaire Behind LaCroix Accused of Improper Touching by Two Pilots."  The article reported, in part:

Two pilots have filed lawsuits alleging sexual harassment by the billionaire behind LaCroix sparkling water, claiming 82-year-old Nick A. Caporella inappropriately touched them on multiple trips while they were flying with him in the cockpit of his business jet.

The allegations by the former employees, both men, were made in lawsuits filed in the past two years in Florida and name both the chief executive and National Beverage Corp. as defendants. Mr. Caporella is the chairman, chief executive and controlling shareholder of National Beverage, which has a market value of $5 billion, thanks to surging LaCroix sales.

Mr. Caporella, a rare CEO who also pilots the corporate jet, and the company have denied the allegations in court documents. *The suits claim the unwanted touching occurred on more than 30 trips from 2014 to 2016.*

\* \* \*

One lawsuit was filed by pilot Terence Huenefeld and his wife. Mr. Huenefeld, who spent about five months working for Mr. Caporella, accused the CEO of unwanted touching on 18 flights between March and July 2016, according to court documents.

The lawsuit alleged Mr. Caporella engaged in "repeated unjustified, unwarranted and uninvited grabbing, rubbing and groping of Terry's leg in a sexual manner, reaching up towards Terry's sexual organs."

\* \* \*

The second pilot, Vincent Citrullo, alleged in his lawsuit *a similar pattern of behavior* during more than a year flying alongside Mr. Caporella. The lawsuit claims that on 14 flights from March 2014 to July 2015, Mr. Caporella engaged in unwanted touching, including grabbing Mr. Citrullo under his armpit, under his thigh and moving his right hand up Mr. Citrullo's left leg towards his genitals.

Reached by phone Tuesday, *Mr. Citrullo said he stands by his allegations "100%. It was definitely inappropriate."*

15.     On this news, National Beverage's share price fell $2.90, or 2.64%, over the following two trading days, closing at $107.04 on July 6, 2018.

16.     Then, on October 1, 2017, a consumer class action case was filed in Illinois, *Rice v. National Beverage Corp. s/b/a LaCroix Sparkling Waters,* Case No. 2018CH12302, in the Circuit Court of Cook County, Illinois ("Consumer Class Action") alleging that the Company's

marketing and representation of LaCroix as "all natural" and "100% natural" were false. Throughout the month of October 2018, Defendants disputed the allegations. However, on October 30, 2018, a Dow Jones article, entitled LaCroix Loses Fizz After Lawsuit -- Market Talk, disclosed that "LaCroix seltzer sales dropped 3% in the two weeks ended Oct 21 after a lawsuit against manufacturer National Beverage Corp alleged that the bubbly beverage doesn't contain all natural ingredients as advertised, according to a Susquehanna analysis of IRI data."  According to the survey, 28% of LaCroix consumers drink LaCroix because they believe it is natural.

17.     Upon the risk materializing that consumers would drink less of LaCroix because of the challenge to it being 100% natural or all natural, the stock plummeted, dropping from $100.60 to close on October 30, 2018 at $95.89, falling 5%.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

21.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as National Beverage's principal executive offices are located within this Judicial District.

22.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

23.     Plaintiff, as set forth in his previously-submitted Certification, acquired National Beverage's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

24.     Defendant National Beverage is headquartered in Fort Lauderdale, Florida, with principal executive offices located at 8100 SW Tenth Street, Suite 4000, Fort Lauderdale, Florida 33324.  National Beverage's securities trade on the NASDAQ under the ticker symbol "FIZZ."

25.     Defendant Caporella has served at all relevant times as the Company's CEO and Chairman.

26.     Defendant George R. Bracken ("Bracken") has served at all relevant times as the Company's Executive Vice President of Finance.

27.     The Defendants referenced above in ¶¶ 25-26 are sometimes referred to herein as the "Individual Defendants."

28.     The Individual Defendants possessed the power and authority to control the contents of National Beverage's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been

disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

29.     National Beverage, through its subsidiaries, develops, produces, markets, and sells a portfolio of flavored beverage products in North America and internationally. The Company offers beverages to the active and health-conscious consumers, including sparkling waters under the LaCroix, LaCroix Cúrate, LaCroix NiCola, and Shasta Sparkling Water brand names.  It serves retailers, as well as various up-and-down-the-street accounts through the take-home, convenience, and food-service distribution channels.  The Company sells and markets its products through an internal sales force, as well as specialized broker networks.

30.     Thousands of customers purchase LaCroix based on Defendants' marketing and labeling that LaCroix is "all natural" and "100% natural." Defendants' market these claims on the cans of LaCroix themselves, as well as on their website and in their press releases and public filings.

31.     National Beverage's touted growth was primarily concentrated from LaCroix.  On May 4, 2017, a *Credit Suisse* report entitled "FY17 Pre-release Spot On Expectations" issued by Laurent Grande ("Grande") estimated that LaCroix grew 60% while the remainder of the Company's portfolio grew only 2%.

32.     By the first quarter of 2018, analysts estimated that LaCroix accounted for 48% of its total sales.  Therefore, any issue with LaCroix sales and growth was closely followed by the analysts and the market.

**Failure to Comply with GAAP**

33.     GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured.  GAAP are the official accounting standards and have been codified and are primarily promulgated by the Financial Accounting Standards Board ("FASB").  These standards have been adopted by the SEC, which requires the financial statements of filers to adhere to such.

34.     Despite the Company's vulnerability from its outsized concentration of revenues in LaCroix, it failed to disclose such concentration under GAAP accounting.  Throughout the Class Period, analysts estimated that LaCroix accounted for close to 50% of National Beverage's total sale-a huge concentration.  ASC 275-10-50 requires the following disclosures:

...

**Current Vulnerability Due to Certain Concentrations**

**50-16** Vulnerability from concentrations arises because an entity is exposed to risk of loss greater than it would have had it mitigated its risk through diversification. Such risks of loss manifest themselves differently, depending on the nature of the concentration, and vary in significance. Financial statements shall disclose the concentrations described in paragraph 275-10-50-18 if, based on information known to management before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25), all of the following criteria are met:

   a.  The concentration exists at the date of the financial statements.
   b.  The concentration makes the entity vulnerable to the risk of a near-term severe impact.
   c.  It is at least reasonably possible that the events that could cause the severe impact will occur in the near term.

**50-17** This Subtopic requires disclosure of certain defined concentrations known to management rather than a wider range of concentrations based on information of which management is reasonably expected to have knowledge.

**50-18** Concentrations, including known group concentrations, described below require disclosure if they meet the criteria of paragraph 275-10-50-16. (Group concentrations exist if a number of counterparties or items that have similar economic characteristics collectively expose

the reporting entity to a particular kind of risk.) Some concentrations may fall into more than one of the following categories:

a. Concentrations in the volume of business transacted with a particular customer, supplier, lender, grantor, or contributor. The potential for the severe impact can result, for example, from total or partial loss of the business relationship. For purposes of this Subtopic, it is always considered at least reasonably possible that any customer, grantor, or contributor will be lost in the near term.

b. Concentrations in revenue from particular products, services, or fund-raising events. The potential for the severe impact can result, for example, from volume or price changes or the loss of patent protection for the particular source of revenue.

c. Concentrations in the available sources of supply of materials, labor, or services, or of licenses or other rights used in the entity's operations. The potential for the severe impact can result, for example, from changes in the availability to the entity of a resource or a right.

d. Concentrations in the market or geographic area in which an entity conducts its operations. The potential for the severe impact can result, for example, from negative effects of the economic and political forces within the market or geographic area. For purposes of this Subtopic, it is always considered at least reasonably possible that operations located outside an entity's home country will be disrupted in the near term.

**50-20** Disclosure of concentrations meeting the criteria of paragraph 275-10-50-16 shall include information that is adequate to inform users of the general nature of the risk associated with the concentration.

35.     Financial statements (including footnote disclosures) are a central feature of financial reporting and are a principal means of communicating accounting information to parties external to an entity, such as investors and lenders.[1]  SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading or inaccurate, despite footnote or other disclosure. (17 C.F.R. § 210.4-01(a)(1)). SEC Regulation S-X also requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying the latest annual financial statements.  (17 C.F.R. § 210.10-01(a)).

---

[1]     Statement of Financial Accounting Concepts ("FASCON") No. 1, *Objectives of Financial Reporting by Business Enterprises* ("FASCON 1"), ¶ 6.

36.     Further, beyond the requirement to present financial statements in accordance with GAAP and SEC Regulations discussed above (amongst others), the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, requires every registrant to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions of the Company.  (15 U.S.C. §78m).  Much of the language used by the SEC comes directly from the Foreign Corrupt Practices Act, which dates to 1977, and was the primary authority concerning a company's obligation to maintain accurate books and records prior to the codification by the SEC.[2]

37.     The fair presentation of financial statements in conformity with GAAP is the responsibility of a company's management. Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. (See, e.g., AU 110, *Responsibilities and Functions of the Independent Auditor* ("AU 110"), .03).

38.     The conceptual framework underlying financial accounting and reporting, especially the rules that comprise the accrual-based accounting required by the standards adopted by the SEC (i.e., GAAP), are set forth, among other places, in Statements of Financial Accounting Concepts ("FASCONs") promulgated by the Financial Accounting Standards Board.

39.     Statement of Financial Accounting Concepts ("FASCON") No. 8, *Conceptual Framework for Financial Reporting - Chapter 1, The Objective of General Purpose Financial Reporting, and Chapter 3, Qualitative Characteristics of Useful Financial Information* ("FASCON 8"), specifically, states that "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential

---

[2]     Anti-Bribery and Books & Records Provisions of the Foreign Corrupt Practices Act; United States Code; Title 15 – Commerce and Trade; Chapter 2B – Securities Exchanges; §78m(b)(2)(A).

investors, lenders, and other creditors in making decisions about providing resources to the entity."
(FASCON 8, OB2).

40.    This framework also states that "[i]nvestors', lenders' and other creditors'
expectations about returns depend on their assessment of the amount, timing and uncertainty of
(the prospects for) future net cash inflows to the entity," and that, "[c]onsequently, existing and
potential investors, lenders and other creditors need information to help them assess the prospects
for future net cash inflows to an entity." (FASCON 8, OB3).

41.    FASCON 8 also offers that, in order to assess an entity's prospects for future net
cash inflows, "existing and potential investors, lenders and other creditors need information about
the resources of the entity, claims against the entity." (FASCON OB4).  It is also states that
investors and other creditors are interested to know and understand, among other things, "how
efficiently and effectively the entity's management and governing board have discharged their
responsibilities to use the entity's resources," examples such responsibilities including "protecting
the entity's resources from unfavorable effects of economic factors such as price and technological
changes and ensuring that the entity complies with applicable laws, regulations and contractual
provisions." (FASCON 8, OB4).

42.    Further, it provides that "[m]any existing and potential investors, lenders and other
creditors cannot require reporting entities to provide information directly to them and must rely on
general purpose financial reports for much of the financial information they need. Consequently,
they are the primary users to whom general purpose financial reports are directed."  (FASCON 8,
OB5).

43.    FASCON 8 asserts that, for financial information to be useful, "it must be relevant
and faithfully represent what it purports to represent. The usefulness of financial information is

enhanced if it is comparable, verifiable, timely, and understandable." (FASCON 8, QC4).  In that context, the framework states: "[r]elevant financial information is capable of making a difference in the decisions made by users. Information may be capable of making a difference in a decision even if some users choose not to take advantage of it or already are aware of it from other sources." (FASCON 8, QC6).

44.     It also states:

> Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and free from error.

(FASCON 8, QC12).

45.     Any conclusion the market and analysts reached during the Class Period about LaCroix's growth and sales would have a major impact on the Company's stock given the significant concentration of total sales emanating from LaCroix.

46.     Defendants failure to comply with GAAP and disclose the concentration in sales the Company was generating from LaCroix caused a downturn in stock price as analysts deemed the financials "opaque" and were unable to accurately forecast target pricing and issues with the Company. Analysts and investors alike did not have adequate information to calculate any risk associated with the concentration.

**Confidential Witnesses**

47.     CW1 served as an area sales manager in National Beverage's southeast region from May 2012 through January 2017.

48.     Over the five years CW1 spent at National Beverage it was CW1's understanding that the Company's year-over-year growth was flat.

49. CW1 stated that VPC and VPO were not metrics that the stores CW1 distributed product to were graded on. CW1 stated that if VPC did exist, employees did not track it.

50. During CW1's employment at National Beverage, CW1 never used or heard of velocity per capita. To CW1's knowledge, the VPC and VPO metrics were not used at National Beverage.

51. CW1 stated that the VPC and VPO were likely metrics made up by Defendant Caporella.

52. CW2 served as a human resource specialist at National Beverage Corp., from September 2016 to September 2017, and reported to Senior Human Resources & Recruitment Manager Ivy Carr.

53. Each morning the finance team at National Beverage's corporate office compiled a financial statement detailing the company's latest sales numbers, which was reviewed first by President Joe Caporella, and then forwarded to CEO Nick Caporella.

54. CW2 never heard the company's management discuss VPO and VPC on internal company conference calls or in meetings.

55. CW2 stated that the marketing department looked at the sales volume data daily as did the finance team, and used them to build the annual and quarterly reports. CW2 stated that none of the reports contained information about VPO or VPC.

56. CW3 worked as a production supervisor for National Beverage, Inc. from January 2012 to July 2014. CW3 stated that inside the company word got around that the owner of the company was inappropriate with women, that he had made comments and gestures to female subordinates.

57. CW3 said it had happened in Florida and prompted a company-wide memo about sexual harassment.  Although Defendant Caporella was not mentioned in the memo, it was communicated to staff that he was the impetus for the campaign, including the required viewing of a video on sexual harassment.

58. CW4 worked in a variety of senior roles related to LaCroix for National Beverage, Inc., from August 2013 to April 2018, including Western Regional Sales Manager, Western Divisional Manager and Natural Channel Strategic Leader – Total U.S., and Vice President of Business Development. CW4 maintained daily communication with President Joe Caporella, who also was CW4's direct supervisor for at least two years.

59.   CW4 stated that only a small handful of senior executives were permitted to see the total financial picture of the Company.  CW4 stated that the Company never shared the total picture with a lot of the management team.

60.   CW4 stated that early in CW4's tenure, CW4 did see the full financials, and referenced those figures in a meeting, citing the company's annual revenues and how many cases it had sold. CW4 was reprimanded by Joe Caporella for doing so and was told that it was proprietary information.

61.   CW4 believes the only people authorized to see the full financials were the Chief Financial Officer; Joe Caporella; George Bracken; Tripp Erwin, the executive vice president of sales for Shasta; and Andrew LaBarbera, group controller.

62.   CW4 also stated that Defendant Caporella incorrectly stated to investors and the SEC that the VPO was a proprietary metric exclusive to National Beverage. Further, CW4 stated that never once during CW4's tenure working exclusively with LaCroix did anyone mention the VPC metric.

63.     In May 2017, CW4 participated in a phone conference with Joe Caporella and other senior executives, including Michael Bahr, who unexpectedly announced that National Beverage might be in violation of the federal Robinson-Patman Act.

64.     Throughout 2017, CW4 and CW4's team tried to create new distribution partnerships for LaCroix. Their efforts were shut down by Joe Caporella, Michael Bahr and Alan Domzalski, who claimed the new deals conflicted with existing companies. The team investigated several of those companies and found that they appeared to be owned by National Beverage. As a result, CW4 believes that National Beverage executives were creating fake companies to generate fake invoices to help offset shortfalls between National Beverage's revenue projections and its actual sales.

65.     Three to four years earlier, CW4 was told about Caporella's alleged proclivities by another National Beverage employee, who met some pilots who had flown Defendant Caporella's plane.  One of the stories was that Defendant Caporella had left one of the pilots stranded at an airport after he refused Caporella's advances.

**CMA Agreement**

66. Throughout the Class Period, the Company retained a third party to advise its operational and financial business.  The third party received a percentage of the Company's yearly profits, and consisted of top executives at National Beverage, including Defendants Caporella and Bracken.  On August 27, 2018, National Beverage filed its annual proxy statement on Schedule 14A included the following statement about Defendant Caporella:

> CMA, pursuant to a management agreement, provides the services of and compensates the Company's Chief Executive Officer, Chief Financial Officer and senior and other corporate personnel who provide management, administrative and creative functions to the Company. . . . [D]ue to Mr. Caporella's 100% ownership of CMA, the entire management fee paid to CMA be reflected as

16

compensation to Mr. Caporella in the body of the Summary Compensation Table. As a result, we agreed (for reporting purposes) to include the management fee paid by the Company to CMA under the caption "All Other Compensation" with respect to Mr. Nick A. Caporella in the Summary Compensation Table. We believe this method of reporting is misleading and could lead the reader to construe that these amounts are paid by the Company or CMA directly to Mr. Nick A. Caporella. The amounts paid by the Company to CMA, as reflected in the Summary Compensation Table, should not be interpreted as the actual amount of compensation paid to Mr. Nick A. Caporella by either the Company or CMA and are shown only to comply with the comment letter dated February 9, 2009**.** The cash compensation of Mr. Bracken, who serves as Principal Financial Officer of National Beverage Corp., is also paid by CMA and is included under the "All Other Compensation" caption in the Summary Compensation Table. (See "Certain Relationships and Related Party Transactions".)

67.     In the definitive proxy on Schedule 14A issued on August 27, 2018, National Beverage indicated that Defendant Caporella received total compensation of $9,757,340 and provided the following statement explaining his unique employment status:

Mr. Nick A. Caporella, our Chairman of the Board and Chief Executive Officer, and Mr. George R. Bracken, our Executive Vice President-Finance, do not receive any cash compensation from the Company as their services are provided to us through CMA. As described above in "Compensation Discussion and Analysis" and "Management Services Agreement – Compensation", we pay an annual base management fee equal to one percent of our consolidated net sales for the services that CMA provides, which include, among other things, the services of Mr. Nick A. Caporella and Mr. Bracken and other senior and corporate personnel who are not required to be included in the table above. . .  The amounts set forth with respect to Mr. Nick A. Caporella under the caption "All Other Compensation" represent the total management fees paid by us to CMA for the respective fiscal years and should not be interpreted as the actual compensation paid to Mr. Nick A. Caporella by either the Company or CMA and are shown only to comply with the Commission comment letter dated February 9, 2009. The amounts set forth with respect to Mr. Bracken under the caption "All Other Compensation" represent payments to him by CMA.

### Materially False and Misleading Statements Issued During the Class Period

68. The Class Period begins on July 17, 2014, when National Beverage filed its annual report for the fiscal quarter and year ended May 3, 2014 (the "2014 10-K"). For fiscal year 2014, National Beverage reported net income of $43.64 million, or $0.92 per diluted share, on revenue of $641.14 million, compared to net income of $46.92 million, or $1.01 per diluted share, on revenue of $662.01 million for the same period in the same period in fiscal year 2013.

69. In the 2014 10-K, National Beverage advised investors that its Code of Ethics was available on the Company's website. National Beverage's Code of Ethics (revised as of August 2016) states, in relevant part:

POSITIVE WORK ENVIRONMENT

The Company has an anti-harassment policy committed to providing a positive work environment for all of its employees. ***Any type of harassment, whether of a racial, sexual, ethnic, or other nature, is absolutely prohibited.*** The Company actively enforces its policy against harassment and employees are encouraged to review that policy in detail. The policy applies to all conduct on the Company's premises and to all conduct off the Company's premises that affects an employee's work environment. It applies not only to relationships with and conduct toward other employees; it also applies to how employees conduct themselves with respect to representatives of suppliers, customers, and others with whom the Company has business relations. The Company considers violation of the policy to be a serious offense that will lead to discipline, up to and including discharge.

Harassment comes in many forms and may be physical, verbal, mental, or emotional. Generally, it is any conduct directed toward another person that, when viewed by a reasonable person, would or could be perceived as objectionable. Harassment includes creating a hostile work environment or permitting one to exist. (Emphasis added.)

70. The 2014 10-K was signed by Defendants Caporella and Bracken and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Caporella and Bracken, stating that "[t]he information contained in the [2014 10-K] fairly presents, in all material respects, the financial condition and result of operations of the Company."

71. On July 26, 2015, National Beverage filed its annual report for the fiscal quarter and year ended May 2, 2015 (the "2015 10-K"). For fiscal year 2015, National Beverage reported net income of $49.31 million, or $1.05 per diluted share, on revenue of $645.83 million, compared to net income of $43.64 million, or $0.92 per diluted share, on revenue of $641.14 million for the same period in fiscal year 2014.

72. In the 2015 10-K, National Beverage advised investors that its Code of Ethics was available on the Company's website. Upon information and belief, National Beverage's Code of Ethics contained the representations regarding the Company's purported anti-harassment policy described *supra*.

73. The 2015 10-K was signed by Defendants Caporella and Bracken and contained signed certifications pursuant to SOX by Defendants Caporella and Bracken, stating that "[t]he information contained in the [2015 10-K] fairly presents, in all material respects, the financial condition and result of operations of the Company."

74. On July 14, 2016, National Beverage filed its annual report for the fiscal quarter and year ended April 30, 2016 (the "2016 10-K"). For fiscal year 2016, National Beverage reported net income of $61.2 million, or $1.31 per diluted share, on revenue of $704.79 million, compared to net income of $49.31 million, or $1.05 per diluted share, on revenue of $645.83 million for the same period in fiscal year 2015.

75. In the 2016 10-K, National Beverage advised investors that its Code of Ethics was available on the Company's website. Upon information and belief, National Beverage's Code of Ethics contained the representations regarding the Company's purported anti-harassment policy described *supra*.

76. The 2016 10-K was signed by Defendants Caporella and Bracken contained signed certifications pursuant to SOX by Defendants Caporella and Bracken, stating that "[t]he information contained in the [2016 10-K] fairly presents, in all material respects, the financial condition and result of operations of the Company.

77.   The statements referenced in ¶¶68-76 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) National Beverage's Chairman and CEO, Defendant Caporella, engaged in a pattern of sexual misconduct between 2014 and 2016; (ii) Natural Beverage financial statements failed to comply with GAAP primarily due to failure to make sufficient disclosures relating to the concentration of the Company's revenues in LaCroix; and (iii) as a result, National Beverage's public statements were materially false and misleading at all relevant times.

78.   On May 4, 2017, National Beverage issued a press release, which was later filed as an attachment to a Form 8-K with the SEC, announcing financial results for FY2017:

- Revenue of $826 million, up 17% from FY 2016
- Net Income of $106 million, up 73%
- EPS of $2.27, up 73%
- EBITDA* of $174 million, up 66%

79. The financial statements in ¶78 were misleading because they failed to comply with GAAP, primarily due to failure to make sufficient disclosures relating to the concentration of the Company's revenues in LaCroix;

80. In the May 4, 2017 press release, Defendants responded to a Maxim Group short seller report that issued a Sell rating based on a lack of transparency, poor corporate governance,

competitive pressures, and limited growth outside of the LaCroix, quoting Defendant Caporella as follows:

> Maxim Group this morning released a report that National Beverage Corp. (NASDAQ: FIZZ) believes contains self-serving, misguided valuation and flawed analysis.
>
> ****
>
> I am certain Maxim's ultimate goal is to create havoc and deliberately misguide investors in order to profit from a short position

81.  Also the May 4, 2017 press release attributed quotes to Defendant Caporella regarding proprietary metrics used to support its growth:

> National Beverage is unique – I want to assist those who write about LaCroix and Shasta SDA (soft drink alternative) future growth prospects and ultimate value, while still maintaining our edge or pathways to our fabulous growth probabilities[.]
> VPO – VPC Dynamics
>
> National Beverage employs methods that no other company does in this area – VPO (velocity per outlet) and VPC (velocity per capita). We utilize two proprietary techniques to magnify these measures and this creates growth never before thought possible. Unique to National Beverage is creating velocity per capita through proven velocity predictors. Retailers are amazed by these methods and find before and after changes so dynamic that they demand we afford them the use of these methods as frequently as possible.

82.   These statements in ¶¶80-81 were false and misleading because, according to the Company's later disclosures and reports from former employees, the metrics were not a proprietary, the metrics did not create growth opportunities, and the metrics were not presented to retailers in connection with sales activity.

83.    The Company would later reveal that:

a.   VPO data was collected only for certain customers and could not practically be used to establish goals or targets for the Company as a whole; VPO data could

not be applied to every customer;

    b.  VPC data was used primarily to quantify the average number of beverages by category that people consume each year in the United States;

    c.  VPC highlights the opportunity for growth by comparing per capita consumption of sparkling water in the United States to that of other developed markets; and

    d.  the metrics were used primarily for brand planning and execution for specific customers.

84. CW1 stated that VPC and VPO were not metrics that the stores CW1 distributed product to were graded on. If VPC did exist, employees did not track it.  During CW1's employment at National Beverage, CW1 never used or heard of velocity per capita. The VPC and VPO metrics were not used at National Beverage.  CW1 also stated that the VPC and VPO were likely metrics made up by Defendant Caporella.

85. CW2 served as a human resource specialist at National Beverage Corp., from September 2016 to September 2017. Each morning the finance team at National Beverage's corporate office compiled a financial statement detailing the company's latest sales numbers, which was reviewed first by President Joe Caporella, and then forwarded to CEO Nick Caporella. CW2 never heard the company's management discuss VPO and VPC on internal company conference calls or in meetings. CW2 stated that the marketing department looked at the sales volume data daily as did the finance team, and used them to build the annual and quarterly reports. CW2 stated that none of the reports contained information about VPO or VPC.

86. CW4 stated that Defendant Caporella incorrectly stated to investors and the SEC that the VPO was a proprietary metric exclusive to National Beverage. Further, CW4 stated that never once during CW4's tenure working exclusively with LaCroix did anyone mention the VPC metric.

87. The May 4, 2017 press release further stated that "LaCroix and Shasta SDA are innocent, easily accessible, great choices."  At all relevant times, National Beverage used the term "innocent" to convey the purportedly "natural" character of LaCroix.

88. The statement in ¶87 was false and misleading because LaCroix was not 100% natural as the Company had claimed.

89. On May 5, 2017, National Beverage issued a press release, which was later filed with the SEC, announcing a special cash dividend that included the following statements attributed to Defendant Caporella:

> Our impressive VPO calculator that was reflected on the cover of our fiscal year 2015 Proxy is flashing solid green numbers as we bring FY2017 to a close. That flashing light reflects much – investor contentment yes, but also the new Mom who found that morning sickness was cured with LaCroix . . . the suffering diabetic who found new joy with our innocent sparkling water . . . the guy who lost 40 pounds and found a new life with our calorie-free sparkling water and, if I dared, this entire letter would be full of these stories. We are making history with our innovation and America is getting healthier by our pledge. That green light is joy flashing – real genuine joy – and while we truly recognize our blessings, we also acknowledge that barring some catastrophic consequence, we are supremely mated to this purpose – this inveterate of good fortune – as far as our hearts can feel. Yes, we are!

90. These statements from the May 5, 2017 press release cited in ¶89 were false and misleading because, as described above, National Beverage's sales claims and the supposed underlying "proprietary techniques" lacked a verifiable basis and were not important metrics used to determine sales.

91. On June 2, 2017, National Beverage issued a press release, which was later filed

23

with the SEC, regarding the ex-dividend date of the Company's stock that included the following statements attributed to Defendant Caporella:

> *FIZZ* increased $12.88 per share from the day our Board declared this special cash dividend, and achieved record-high closing prices for five consecutive days prior to the ex-dividend date.
>
> Exponential momentum continues to drive our financial results, National Beverage broke multiple records in Fiscal Year 2017 as our financial and brand growth led the industry, and our Fiscal Year 2018 is off to an even stronger start. Our operating margins for May will match revenue growth, and that is quite an accomplishment.
>
> ****
>
> LaCroix is setting the pace for retailer shelf reallocation while fueling a new standard for VPO (velocity per outlet) and VPC (velocity per capita). The month of May is the engine for what appears to start a great summer and another great year for our *FIZZ* investors[.]

92.     Defendants statements in ¶91 were false and/or misleading statements and/or failed to disclose that:

a.   National Beverage's sales claims and the supposed underlying "proprietary techniques" lacked a verifiable basis and were not important metrics used to determine sales;

b.   Natural Beverage financial statements failed to comply with GAAP; and

c.   as a result, National Beverage's public statements were materially false and misleading at all relevant times.

93.     On July 13, 2017, National Beverage filed its annual report on Form 10-K for its fiscal year ended April 29, 2017.  The 10-K was signed by Defendants Caporella and Bracken, and contained Certifications pursuant Sarbanes-Oxley signed by Caporella and Bracken, which stated that:

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; [and]

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report …

94.     In its Form 10-K filed on July 13, 2017, National Beverage described its sales and marketing program, dropping any mention of VPO – VPC Dynamics.

95.     In its Form 10-K filed on July 13, 2017, National Beverage touted accelerating net sales growth, stating as follows:

Net sales for fiscal year ended April 29, 2017 ("Fiscal 2017") increased 17.3% to $826.9 million compared to $704.8 million for fiscal year ended April 30, 2016 ("Fiscal 2016"). The increase in sales resulted primarily from a 16.6% increase in case volume and, to a lesser extent, a higher average selling price. Power+ Brands volume increased 42.6%; branded carbonated soft drinks volume was flat.

Net sales for Fiscal 2016 increased 9.1% to $704.8 million compared to $645.8 million for the fiscal year ended May 2, 2015 ("Fiscal 2015"). The higher sales resulted from a 9.0% increase in case volume and a slight increase in average selling price. The volume increase includes 31.4% growth of our Power+ Brands, partially offset by a decline in carbonated soft drinks.

96.     In its Form 10-K filed on July 13, 2017, National Beverage touted accelerating gross profit, stating as follows:

Gross profit for Fiscal 2017 increased 35.1% to $326.1 million compared to $241.4 million for Fiscal 2016. The increase in gross profit is due to increased volume, growth in higher margin Power+ Brands and a decline in cost of sales per case of 5.7%. The decline in cost of sales per case was due to favorable product mix changes and lower raw material costs. Gross margin expanded to 39.4%.

Gross profit for Fiscal 2016 increased 10.2% to $241.4 million compared to $219.1 million for Fiscal 2015. The increase in gross profit is primarily due to higher sales and a decline in cost of sales per case of .4%. The decrease in cost of sales per case was due to favorable product mix changes and lower raw material costs. As a result, gross margin improved to 34.3%.

In its Form 10-K filed on July 13, 2017, National Beverage disclosed net sales for the first quarter of 2017 of $217,108,000; net sales for the second quarter of 2017 of $203,180,000; net sales for the third quarter of 2017 of $194,564,000; and net sales for the fourth quarter of 2017 of $212,066,000

In its Form 10-K filed on July 13, 2017, National Beverage disclosed net sales for the first quarter of 2016 of $185,386,000; net sales for the second quarter of 2016 of $178,678,000; net sales for the third quarter of 2016 of $161,687,000; and net sales for the fourth quarter of 2016 of $179,034,000

On July 13, 2017, National Beverage issued a press release in connection with the filing of its annual report, which attributed the following statements to Defendant Caporella:

The release of our year-end financial statements certified that FY 2017 was the best year in the history of National Beverage – absolutely! Beating the estimates of both our fans and cash-poor detractors, and even *our own* 'look-see' estimate, *Team National* posted industry-leading revenue and earnings growth. Our long-term shareholders also enjoyed another banner year; 90% price appreciation + $1.50 per share dividend paid + another $1.50 per share dividend payment on the way.

97.     These statements from the 10-K cited in ¶¶93-96 were false and misleading because National Beverage's Natural Beverage financial statements failed to comply with GAAP primarily due to failure to make sufficient disclosures relating to the concentration of the Company's revenues in LaCroix.

98.     The Form 10-K filed on July 13, 2017 described LaCroix "as 100% naturally essenced" and as "the top-selling all natural domestic sparkling water."  This statement was false because LaCroix was not 100% natural.

26

99.     On July 13, 2017, National Beverage issued a press release in connection with the filing of its annual report, which attributed the following statements to Defendant Caporella:

> When people ask why National Beverage's stock trades the way it does . . . I remind them that a pharmaceutical company that develops a drug with the potential to help or cure (although that drug may only be sold in a part of the United States) . . . its *potential* is being traded.
>
> When potential is unable to be quantified, but is undergoing excessive growth performance (with no visible end to these remarkable results), it qualifies for . . . GPE – Gross Price/Earnings Index or Price/Earnings Ratios that reflect this financial phenomenon.

100.     In the July 13, 2017 press release, National Beverage reported the following financial results:

Fiscal Year Ended/ Three Months Ended

|            | April 29, 2017 | April 30, 2016 | April 29, 2017 | April 30, 2016 |
|------------|----------------|----------------|----------------|----------------|
| Net Sales  | $ 212,066      | $ 179,034      | $ 826,918      | $704,785       |
| Net Income | $ 29,161       | $ 17,537       | $ 107,045      | $ 61,198       |

101.     These disclosures violated GAAP because the Company did not make required disclosures regarding revenue and sales for LaCroix, its largest product line by far, in violation of GAAP.  These GAAP violations caused analysts confusion.  For example, Credit Suisse analyst Laurent Grandet issued an analyst report on July 13, 2017 stating "In addition, outside of the scanner data, we still know very little about the remainder of the portfolio and what is actually driving the performance. A key risk to our valuation and Neutral rating is a shift in consumer demand for key products and increased competition." However, based on the information the analysts had at the time, they were positive on the stock.

102.     On August 4, 2017, National Beverage issued a press release, which was later filed with the SEC, announcing a special cash dividend and included the following statements:

As I reflect on the growth of your company since our first common stock dividend was paid, a metamorphic evolution has indeed taken place. For our FY 2004, we reported revenue growth of 2.3%, operating profits of $29.7 million and basic earnings per share of $.42. As you are aware, results for our FY 2017 set new records: revenue growth of 17%, operating profits of $162 million and earnings per share of $2.30. Better still, as I previously advised you, our new FY 2018 is off to an even stronger start.

103.    In the August 4, 2017 press release, Natural Beverage's financial statements failed to comply with GAAP primarily due to failure to make sufficient disclosures relating to the concentration of the Company's revenues in LaCroix.

104.    On August 28, 2017, National Beverage issued its definitive proxy on Schedule 14A, which stated that Defendant Caporella controlled 73.5 percent of National Beverage's common stock.  Defendant Caporella was the only board member up for election during the year.

105.    On September 7, 2017, National Beverage filed its quarterly report on Form 10-Q for the period ended July 29, 2017.  National Beverage reported the following results:

Three Months Ended July 29, 2017 (first quarter of fiscal 2018) compared to Three Months Ended July 30, 2016 (first quarter of fiscal2017)

Net sales for the first quarter of fiscal 2018 increased 19.7% to $259.8 million compared to $217.1 million for the first quarter of fiscal 2017. The increase in sales resulted primarily from a 14.9% increase in case volume and, to a lesser extent, a higher average selling price. The volume increase includes 37.9% growth of our Power+ Brands, partially offset by a decline in Carbonated Soft Drinks. Average selling price per case increased 2.6% due to changes in product mix.

Gross profit for the first quarter of fiscal 2018 increased 22.2% to $104.5 million compared to $85.5 million for the first quarter of fiscal 2017. The increase in gross profit is due to increased volume and growth in higher margin Power+ Brands. The cost of sales per case was flat. As a result, the gross margin improved to 40.2% compared to 39.4% for the first quarter of fiscal 2017.

106.     In the September 7, 2017 Form 10-Q, Defendants bragged that:

> Health and wellness awareness has increased significantly, resulting in growing demand for beverages with little or no calories and **wholesome natural ingredients**. Our brands emphasize distinctly-flavored beverages in attractive packaging that appeal to multiple demographic groups. The attentive, health conscious and discriminating consumer is ever more alert to wellness choices and **better-for-you ingredients** that align to this transition and strategic focus (emphasis added).

107.     The September 7, 2017 10-Q contained signed certifications pursuant to SOX by

Defendants Caporella and Bracken, stating that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; [and]
>
> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report …

108.     On September 7, 2017, National Beverage issued a press release in connection with

the filing of its quarterly report, which attributed the following statements to Defendant Caporella:

> This extraordinary start to our FY2018 marks eleven consecutive quarters of revenue and earnings growth. During this period, our shareholders have enjoyed over 300% increase in their *FIZZ* holdings and over $139 million in cash dividends . . . truly a *'one-of-a-kind'* performance[.]
>
> While momentum signals its presence in a myriad of ways, the one that most excites us is the scent of 'toasted meringue' in our ready-to-launch La Croix Key Lime sparkling water. Why . . . because our heartbeat is *'innovation'* and here that spells . . . *aroma and scents!* While financial performance is ultimately the healthy condition of management's purpose . . . it starts with a naturally essenced strategic growth plan and, certainly, this first quarter is more than robust

109.    In the September 7, 2017 press release, Defendants stated that "[w]hile financial performance is ultimately the healthy condition of management's purpose . . . it starts with a naturally-essenced strategic growth plan and, certainly, this first quarter is more than robust."

110.    In the September 7, 2017, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) National Beverage's sales claims and the supposed underlying "proprietary techniques" lacked a verifiable basis and were not important metrics used to determine sales; (ii) LaCroix was not 100% natural as the Company had claimed; (iii) Natural Beverage financial statements failed to comply with GAAP; and (iv) as a result, National Beverage's public statements were materially false and misleading at all relevant times.

111.    Analysts were still confused about LaCroix data, and Defendant Caporella attacked analysts that questioned the Company.

112.    On October 19, 2017, National Beverage issued a press release, which was later filed with the SEC, announcing its second quarter results.  In the October 19, 2017 press release, National Beverage attributed the following statement to Defendant Caporella regarding volatility in FIZZ's stock price:

> FIZZ revenues have grown 60% over the last ten years – ALL ORGANIC GROWTH – NO ACQUISITIONS! Organic growth has now ACCELERATED!
>
> What's creating the volatility relative to the stock market with FIZZ? Today less than 15% of the daily volume traded on major exchanges is financially driven by company fundamentals. Over 50% of all daily exchange volume is driven by traders gambling on fleeting price moves and stocks paired with derivatives. Are *perpetrators* stimulating self-serving movement by stating falsehoods, creating rumors and deliberately manipulating FIZZ value? We think so!

113.     In the October 19, 2017 press release, Defendant Caporella made the following

statement regarding volatility in FIZZ's stock price:

> Analyst pens headline that FIZZ is weak . . . what the writer
> advocated was to induce short sellers to stampede aboard the passive
> BOT trading wagon. Why? With passive investment accounting for
> over one-third of the market, which does not question logic if prices
> are equitable, BUT merely accepts the stampede-induced results!
> There is no governor or regulatory convenience that accesses the
> reasonableness of the market behavior. Where is the SEC watchdog?
>
> FIZZ extraordinary fundamentals reflect STRONG SUSTAINED
> PERFORMANCE! Are high frequency trading, BOT stampeded
> results, inflated short positions and . . . current world anxiety –
> stimulating strange and unprecedented circumstances?
>
> THE OBSCURE SILVER LINING IS A UNIQUELY-INDUCED
> OPPORTUNITY.
>
> If you have the opinion that I, Nick A. Caporella, am angrily
> exercised while extremely fortunate to be guiding FIZZ, your
> opinion is quite accurate!

114.     In the October 19, 2017 press release, Defendants made materially false and

misleading statements regarding the Company's business, operational and compliance policies.

These statements in ¶¶112-113 were false and/or misleading statements and/or continued to

conceal that: (i) National Beverage's sales claims and the supposed underlying "proprietary

techniques" lacked a verifiable basis and were not important metrics used to determine sales; (ii)

Natural Beverage financial statements failed to comply with GAAP; and (iii) as a result, National

Beverage's public statements were materially false and misleading at all relevant times.

115.     Analysts remained confused about LaCroix's growth and concentration due to the

Company's failure to comply with GAAP.  For example, on October 23, 2017 analyst Zuanic of

Susquehanna issued another research report, focusing on the unknowing of the product mix.

Question1: What is the product mix (i.e., how big is  LaCroix) as

well as the channel mix? The weight in the $ sales mix of the non-Lacroix products, as well as the magnitude of their underperformance, are key questions for us (not just for projecting purposes, but also for sum-of-the-parts valuation analysis; i.e., the EV/sales of Lacroix would be different from Shasta, Faygo, and Rip).

Total unit case volume was up 15% for FIZZ in the July quarter (as per the company's filings), while "power brands and sparkling water" (not just Lacroix) were up 38% (FY16 trends were similar, +17% and +43%, respectively). While the scanner data points to some deceleration for Lacroix, the company's overall performance is accelerating (1Q18 +20% vs. FY17 +17%) as the "other" brands lose weight in the sales mix. •

The scanner data would imply Lacroix is 66% of sales, with "power brands" in total representing 76% (5% from energy, 5% from juices). The performance is mixed for the "other" power brands, with energy down 5% in the July quarter as per the scanner data (up 3% in August/September), and juices flat in the July quarter (+2% in August/ September). • CSDs would be the other 24% if we go by the scanner data (July quarter); CSD sales were flat in the July quarter (IRI scanner) and down 5% in August/September. •

If we assume Lacroix+Energy+Juices (the "power brands") are indeed 76% of $ sales, then the reported July quarter volume changes (38% for power brands, 15% for entire portfolio) would imply CSDs were down -58% (do math). But if power brands are 60% of sales then CSDs would have been down -20% (if 50% then -8%, and if 40% then +0.3%). • But when crossing reported U.S. (or NA) sales with the scanner data implied $ sales (minus a mark-up, as IRI measures $ sales at retail) for various CPG companies, we find FIZZ generates a much lower percentage of sales from IRI channels. Of course in all this we assume the reported sales are correct (and in no way are we insinuating NATIONAL BEVERAGE CORP. LOWERING PRICE TARGET OCTOBER 23, 2017 2 Susquehanna Financial Group, LLLP the contrary), so we assume dollar stores, the military channel, and some institutions account for a sizable piece of sales (that we cannot track). • If we try to reconcile this last point, then we'd say "power brands" are more like 50-60% of sales, and that would mean Lacroix is 40-50% of total company sales (and this is what we model now), well below what the scanner data implies. That would make sense as probably the company does not have good presence in FDM for non-Lacroix products, and vice versa perhaps. • Regardless, for valuation and investment purposes, it would help to know how big Lacroix is for

> FIZZ. As we discuss later, it also has implications for gross margin mix trends (we can reasonably assume Lacroix has higher margins than the rest of the portfolio, and Curate even higher).

116.   Then, on November 20, 2017, Susquehanna upgraded from neutral to positive.

117.   On December 7, 2017, National Beverage filed its quarterly report on Form 10-Q for the period ended October 28, 2017.   National Beverage reported the following results comparing three month periods year-over-year:

> Three Months Ended October 28, 2017 (second quarter of fiscal 2018) compared to Three Months Ended October 29, 2016 (second quarter of fiscal 2017)
>
> Net sales for the second quarter of fiscal 2018 increased 20.1% to $244.1 million compared to $203.2 million for the second quarter of fiscal 2017. The increase in sales resulted primarily from a 17.7% increase in case volume and, to a lesser extent, a higher average selling price. The volume increase includes 41.0% growth of our Power+ Brands, partially offset by a decline in Carbonated Soft Drinks. Average selling price per case increased 1.4% due to changes in product mix.
>
> Gross profit for the second quarter of fiscal 2018 increased 22.1% to $96.1 million compared to $78.7 million for the second quarter of fiscal 2017. The increase in gross profit is due to increased volume and growth in higher margin Power+ Brands. The cost of sales per case was flat. As a result, gross margin improved to 39.4% compared to 38.7% for the second quarter of fiscal 2017.

118.   In its quarterly report filed December 7, 2017, National Beverage announced the following results comparing six month periods year-over-year:

> Six Months Ended October 28, 2017 (first six months of fiscal 2018) compared to Six Months Ended October 29, 2016 (first six months of fiscal 2017)
>
> Net sales for the first six months of fiscal 2018 increased 19.9% to $504.0 million compared to $420.3 million for the first six months of fiscal 2017. The increase in sales resulted primarily from a 16.2% increase in case volume and, to a lesser extent, a higher average selling price. The volume increase includes 39.3% growth of our Power+ Brands, partially offset by a decline in Carbonated Soft

Drinks. Average selling price per case increased 2.0% due to changes in product mix.

Gross profit for the first six months of fiscal 2018 increased 22.1% to $200.6 million compared to $164.2 million for the first six months of fiscal 2017. The increase in gross profit is due to increased volume and growth in higher margin Power+ Brands. The cost of sales per case was flat. As a result, gross margin improved to 39.8% compared to 39.1% for the first six months of fiscal 2017.

119.    The December 7, 2017 Form 10-Q contained signed certifications pursuant to SOX by Defendants Caporella and Bracken, stating that:

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; [and]

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report …

120.    On December 7, 2017, National Beverage issued a press release announcing its financial and operating results for the period ended October 28, 2017, as stated above. The press release quoted Defendant Caporella as follows:

As I previously stated and wrote relative to our strong sustained performance, I sincerely believe that our record second quarter and six-month results more than certify that my statements were accurate . . . twelve consecutive quarters of revenue and earnings growth, the last ten of which include *double-digit* net income increases. Add to that, expanding operating margins, leadership of a consumer revolution and one of the industry's strongest balance sheets, and you have the formula for *impressive, dynamic momentum*.

121.    In the December 7, 2017 10-Q and the December 7, 2017 press release, Defendants made materially false and misleading statements regarding the Company's business, operational

and compliance policies. Specifically, Defendants made false and/or misleading statements and/or continued to fail to disclose that:

a. National Beverage's sales claims and the supposed underlying "proprietary techniques" lacked a verifiable basis and were not important metrics used to determine sales;

b. Natural Beverage financial statements failed to comply with GAAP primarily due to failure to make sufficient disclosures relating to the concentration of the Company's revenues in LaCroix; and

c. as a result, National Beverage's public statements were materially false and misleading at all relevant times.

122.    On December 8, 2017, the market began to learn of the impact that the Company's non-transparent financials would have on the stock price. Analysts issued sell ratings despite positive financials, citing poor corporate governance, lack of transparency and "opaque" financials.   For example, notwithstanding the Company's representations in its May 2017 press releases with respect to "creat[ing] growth never before thought possible," analyst Laurent Grandet of Credit Suisse assigned an "underperform" rating to the Company's stock.  Grandet noted that National Beverage's business was driven "almost entirely" by the success of its LaCroix sparkling water brand, the growth trajectory of which was in fact slowing.

123.    In addition, that same day, Maxim analyst Anthony Vendetti reiterated a "sell" recommendation for National Beverage stock, noting that its "numerous weak brands and opaque financial reporting" made its sale "highly unlikely."

124.    As a result of the market partially acknowledging the Company's opaque financials, its stock dropped $11.91, or 10.56%, to close at $100.84 on December 8, 2017.

125.     However, the market still did not understand the risk that slowing sales and lack of transparency the financials would cause due to Defendants' continued misleading statements. For example, one week later, on December 14, 2017, Sadif Investment Analytics issued a research report, positive on the stock, stating, "National Beverage Corp is a high quality company. With reasonable business rating, it has strong financials and poor corporate governance. In terms of risk, National Beverage Corp, is very safe."

126.     On January 26, 2018, the SEC wrote National Beverage regarding the sufficiency of its prior disclosures.  Specifically, the SEC stated:

> Management's Discussion and Analysis…, Page 16
>
> We note your press release filed with the Form 8-K on May 5, 2017 and the references to velocity per outlet and velocity per capita. You state that you "magnify these measures and this creates growth never before thought possible." You also state that you are "creating velocity per capita through proven velocity predictors." To the extent that VPO and VPC are key performance indicators used in managing your business, please include a discussion of these measures along with comparative period amounts or explain why you do not believe this disclosure is necessary. Refer to Section III.B.1 of SEC Release No. 33-8350.

127.     On February 23, 2018, National Beverage responded to the SEC's letter of January 26, 2018 regarding the sufficiency of its previous disclosures.  Specifically, the National Beverage responded as follows:

> *"VPO – VPC Dynamics National Beverage employs methods that no other company does in this area – VPO (velocity per outlet) and VPC (velocity per capita). We utilize two proprietary techniques to magnify these measures and this creates growth never before thought possible. Unique to National Beverage is creating velocity per capita through proven velocity predictors. Retailers are amazed by these methods and find before and after changes so dynamic that they demand we afford them the use of these methods as frequently as possible."*

This statement characterizes the entrepreneurial spirit of National

36

Beverage and its Chairman. The metrics that Mr. Caporella referenced are used to establish goals for certain customers, but are not utilized to manage the overall executional side of our business. Furthermore, we do not believe our comments relative to VPO/VPC dynamics require explanation as they are proprietary methods that are part of a consumer engagement program called "BrandED". Through this educational program that allows us direct contact with our consumers, we learn about frequency of purchase, consumption, household management and other pertinent facts at various locations and time of purchase. This information is as secretive as the formulas of our beverages and should not be disclosed to our competition.

VPO and VPC therefore are not key performance indicators that would give readers a view of the Company through the "eyes of management" as that term is used in SEC Release No. 33-8350.

128.    On March 8, 2018, National Beverage filed its quarterly report on Form 10-Q for the period ended January 27, 2018.  National Beverage reported the following results comparing three month periods year-over-year:

Three Months Ended January 27, 2018 (third quarter of fiscal 2018) compared to Three Months Ended January 28, 2017 (third quarter of fiscal 2017)

Net sales for the third quarter of fiscal 2018 increased 16.9% to $227.5 million compared to $194.6 million for the third quarter of fiscal 2017. The increase in sales resulted primarily from a 14.9% increase in case volume and, to a lesser extent, a higher average selling price. The volume increase includes 38.0% growth of our Power+ Brands, partially offset by a decline in Carbonated Soft Drinks primarily due to the conclusion of the Company's retail brands business. Average selling price per case increased 2.0% due to changes in product mix.

Gross profit for the third quarter of fiscal 2018 increased 20.1% to $91.2 million compared to $75.9 million for the third quarter of fiscal 2017.  The increase in gross profit is due to increased volume and growth in higher-margin Power+ Brands. Cost of sales per case was flat. As a result, gross margin improved to 40.1% compared to 39.0% for the third quarter of fiscal 2017.

129.    In the 10-Q filed on March 8, 2018, National Beverage announced the following

results comparing six month periods year-over-year:

> Nine Months Ended January 27, 2018 (first nine months of fiscal 2018) compared to Nine Months Ended January 28, 2017 (first nine months of fiscal 2017)
>
> Net sales for the first nine months of fiscal 2018 increased 19.0% to $731.4 million compared to $614.9 million for the first nine months of fiscal 2017. The increase in sales resulted primarily from a 15.8% increase in case volume and, to a lesser extent, a higher average selling price. The volume increase includes 38.9% growth of our Power+ Brands, partially offset by a decline in Carbonated Soft Drinks. Average selling price per case increased 2.0% due to changes in product mix.
>
> Gross profit for the first nine months of fiscal 2018 increased 21.5% to $291.8 million compared to $240.1 million for the first nine months of fiscal 2017. The increase in gross profit is due to increased volume and growth in higher-margin Power+ Brands. Cost of sales per case was flat. As a result, gross margin improved to 39.9% compared to 39.1% for the first nine months of fiscal 2017.

130.   The March 8, 2018 10-Q contained signed certifications pursuant to SOX by Defendants Caporella and Bracken, stating that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; [and]
>
> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report …

131.   In the 10-Q filed on March 8, 2018, Defendants claimed that "National Beverage is evolving to meet the healthy hydration demands of consumers. Health and wellness awareness has increased significantly, resulting in growing demand for beverages with little or no calories and ***wholesome natural ingredients***." (emphasis added).

132.    In the 10-Q filed on March 8, 2018 Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) National Beverage's sales claims and the supposed underlying "proprietary techniques" lacked a verifiable basis and were not important metrics used to determine sales; (ii) LaCroix was not 100% natural as the Company had claimed; (iii) Natural Beverage financial statements failed to comply with GAAP; and (iv) as a result, National Beverage's public statements were materially false and misleading at all relevant times.

133.    Analysts were still positive on the stock; however, not having all of the information they needed to properly assess the stock.  For example, Pablo Zuanic of Susquehanna was positive on the stock, but stated "The bear case calls for Lacroix deceleration and lackluster gross margin trends, neither of which panned out this quarter. It would certainly help if the company could be more open about product mix (Lacroix vs. rest of portfolio? Weight of CSD private-label business?) and could share some thoughts on category outlook and ACV opportunities for Lacroix."

134.    On March 23, 2018, the SEC wrote National Beverage to follow up on a prior request for information relating the sufficiency of FIZZ's disclosures.  Specifically, the SEC stated:

> Management's Discussion and Analysis…, Page 16
>
> 1. We note your response that the VPO and VPC metrics are not used to manage the execution side of your business and are not key performance indicators. However, we note the statement that you "utilize" two proprietary techniques to magnify these measures, which "creates growth never before thought possible." We also note the statement in your press release furnished May 8, 2017 that an "impressive VPO calculator that was reflected on the cover of our fiscal year 2015 Proxy is flashing solid green numbers as we bring FY2017 to a close." Please provide an expanded response that explains the VPO and VPC metrics and reconciles the statements

39

above with the statement that VPO and VPC are not utilized to manage your business and are not key performance indicators.

135.    The price of National Beverage stock declined following the disclosure that VPO and VCP are, in fact, metrics commonly utilized by retail sales company (simply replace "velocity" with "sales") and were utilized primarily for brand planning and execution for specific customers. Upon the market learning that the VPO and VPC metrics were not used to manage the business nor were they key performance indicators, despite the Company's misleading statements in May 2017, the stock dropped  $4.82 from a previous close of $87.65.

136.    On April 24, 2018, National Beverage responded to the SEC's letter of March 23, 2018 requesting additional information.  Specifically, the National Beverage responded as follows:

> VPO (Velocity per Outlet) is calculated by dividing the number of units sold by a given customer during a specified time period by the number of outlets stocking the product. VPC (Velocity per Capita) is calculated by dividing the number of units sold in a given geographic area by the population of the area.
>
> VPO metrics are used to establish goals for certain customers, identify poor performing stores, and, when combined with proprietary customer survey data, utilized to give customers better insight into their consumers. Such data is collected only for certain customers and cannot practically be used to establish goals or targets for the Company as a whole, nor can VPO data be applied to every customer. As a result, such metrics are used primarily for brand planning and execution for specific customers.
>
> The Company uses VPC data primarily to quantify the average number of beverages by category that people consume each year in the United States. VPC highlights the opportunity for growth by comparing per capita consumption of sparkling water in the United States to that of other developed markets. As such, VPC data is often incorporated in customer sales presentations.
>
> Although VPO and VPC are components in marketing and evaluating performance by customer, the data underlying these metrics is proprietary, and we believe the results of this use and the performance of our brands justify the use of the descriptions included in our press releases. This data, as compiled and used by

our marketing section, would not give readers a view of the Company through the "eyes of management" as that term is used in SEC Release No. 33-8350.

137.    On May 14, 2018, the SEC wrote National Beverage stating:

We have completed our review of your filing. We remind you that the company and its management are responsible for the accuracy and adequacy of their disclosures, notwithstanding any review, comments, action or absence of action by the staff.

138.    On June 26, 2018, post-market, the *Wall Street Journal* published an article entitled

"The SEC Has Had Its Own Questions About LaCroix". The article reported, in part:

LaCroix maker National Beverage Corp. FIZZ 2.04% is known for issuing colorful news releases peppered with exclamation points, outsize boasts and attacks on critics. Two of those releases recently caught the attention of the Securities and Exchange Commission, which in January asked the flavored seltzer company to clarify what its billionaire chairman and chief executive, Nick Caporella, meant when he wrote that the company had "magnified" two proprietary sales metrics to create "growth never before thought possible.

In the first of the two releases, dated May 4, 2017, Mr. Caporella wrote: "National Beverage employs methods that no other company does in this area – VPO (velocity per outlet) and VPC (velocity per capita)… Unique to National Beverage is creating velocity per capita through proven velocity predictors. Retailers are amazed by these methods."

The following day, a release described a VPO calculator "flashing solid green numbers as we bring FY2017 to close. The SEC asked the Fort Lauderdale, Fla.-based company to provide "a discussion of these measures along with comparative amounts or explain why you do not believe this disclosure is necessary," according to securities filings.

***In correspondence with the agency disclosed in those filings, National Beverage declined to provide the requested figures.***

"This information is as secretive as the formulas of our beverages and should not be disclosed to our competition," Gregory Cook, the company's controller, wrote in a response to the SEC. The metrics are used to set goals for certain customers and not for the company as a whole, he added. The agency said in May that it had completed

41

its review of the matter.  (Emphasis added.)

139.    The market had now fully realized that the claims about the metrics were not important despite Defendants' representing to investors that these metrics were material to how investors should look at the Company.  On this news, National Beverage's share price fell $9.75, or 8.87%, to close at $100.19 on June 27, 2018.

140.    The risk had also now begun to materialize with respect to the impact the lack of transparency would have on the Company.   Analysts were concerned about the Company's statements going forward.  For example, analyst Anthony Vendetti of Maxim Group issued a report recommending sell, stating, "The SEC corresponded with FIZZ about certain vague language used in its press releases, and we expect it to further scrutinize the company's governance and disclosure practices."

141.    Analyst Pablo Zuanic issued a report attributing the stock price decline to  "mostly to the WSJ article about an SEC inquiry (two back and forth correspondences) regarding the use of terms like "velocity per outlet" and "velocity per capita", in the company's filings (we only say welcome to the big time…)."

142.    On June 27, 2018, National Beverage filed its annual report on Form 10-K for its fiscal year ended April 28, 2018.  The 10-K was signed by Defendants Caporella and Bracken, and contained Certifications pursuant to The Sarbanes-Oxley Act Of 2002 ("SOX") also signed by Caporella and Bracken, which stated that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; [and]
>
> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all

material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report …

143.   In its Form 10-K filed on June 27, 2018, National Beverage described its sales and marketing program without mentioning VPO – VPC Dynamics, stating as follows:

….we maintain and enhance consumer brand recognition and loyalty through a combination of regional event participation, special event marketing, endorsements, consumer coupon distribution and product sampling. Additionally, we offer numerous promotional programs to retail customers, including cooperative advertising support, 'Brand*ED*' ambassadors, in-store promotional activities and other incentives. These elements allow marketing and other consumer programs to be tailored to meet local and regional demographics.

144.   In its Form 10-K filed on June 27, 2018, National Beverage touted accelerating net sales growth, stating as follows:

Net sales for fiscal year ended April 28, 2018 ("Fiscal 2018") increased 18.0% to $975.7 million compared to $826.9 million for fiscal year ended April 29, 2017 ("Fiscal 2017"). The increase in sales resulted primarily from a 19.8% increase in branded case volume and, to a lesser extent, a higher average selling price. Power+ Brands volume increased 38.9%; branded carbonated soft drinks volume declined by 6.2%. The Company discontinued its lower-margin, private-label carbonated soft drink business in the third quarter of Fiscal 2018, allowing future performance to be more focused on brand equity appreciation.

Net sales for Fiscal 2017 increased 17.3% to $826.9 million compared to $704.8 million for the fiscal year ended April 30, 2016 ("Fiscal 2016"). The increase in sales resulted primarily from a 16.6% increase in case volume and, to a lesser extent, a higher average selling price. Power+ Brands volume increased 42.6%; branded carbonated soft drinks volume was flat.

145.   In its Form 10-K filed on June 27, 2018, National Beverage touted accelerating gross profit, stating as follows:

Gross profit for Fiscal 2018 increased 20.0% to $391.1 million compared to $326.1million for Fiscal 2017. The increase in gross

profit is due to increased volume and growth in higher margin Power+ Brands, offset in part by increased cost of sales per case. Cost of sales per case increased 1.0% primarily due to higher aluminum costs. Gross margin expanded to 40.1%.

Gross profit for Fiscal 2017 increased 35.1% to $326.1 million compared to $241.4 million for Fiscal 2016. The increase in gross profit was due to increased volume, growth in higher margin Power+ Brands and a decline in cost of sales per case of 5.7%. The decrease in cost of sales per case was due to favorable product mix changes and lower raw material costs. Gross margin expanded to 39.4%

146.    In its Form 10-K filed on June 27, 2018, National Beverage disclosed net sales for the first quarter of 2018 of $259,832,000; net sales for the second quarter of 2018 of $ 244,119,000; net sales for the third quarter of 2018 of $ 227,477,000; and net sales for the fourth quarter of 2018 of $ 244,306,000.

147.    In its Form 10-K filed on June 27, 2018, National Beverage disclosed net sales for the first quarter of 2017 of $217,108,000; net sales for the second quarter of 2017 of $ 203,180,000; net sales for the third quarter of 2017 of $194,564,000; and net sales for the fourth quarter of 2017 of $212,066,000.

148.    The Form 10-K filed on June 27, 2018 described LaCroix "as 100% naturally essenced".

149.    On June 27, 2018, National Beverage issued a press release in connection with the filing of its annual report, which attributed the following statements to Defendant Caporella:

"Momentum continues with net sales having 14 consecutive quarters of revenue growth that additionally witnessed 16 quarters of consecutive operating income growth!

These results for the comparative previous three years have consistently outperformed the industry and reaffirms our leadership position as the #1 Sparkling Water in North America …."

150.    In addition, the June 27, 2018 press release stated that:

○ **Revenues climb to $976 million:**       **$646 million to $976 million**       *+ 51%*

○ **EBITDA* expands to $217 million:**       **$ 87 million to $217 million**       *+151%*

○ **Operating Profit climbs to 21%:**       **12% to 21%**       *+ 82%*

○ **EPS climbs to $3.21 per share:**       **$1.06 to $3.21**       *+202%*

○ **Year end Cash was $190 million**

○ **Total Cash Dividends paid to date $540 million or $11.66 per share**

151.    The statements in the Form 10-K and press release discussed above were materially false and misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) National Beverage's sales claims and the supposed underlying "proprietary techniques" lacked a verifiable basis and were not important metrics used to determine sales; (ii) LaCroix was not 100% natural as the Company had claimed; (iii) Natural Beverage financial statements failed to comply with GAAP, primarily due to failure to make sufficient disclosures relating to the concentration of the Company's revenues in LaCroix; and (iv) as a result, National Beverage's public statements were materially false and misleading at all relevant times.

152.    On July 3, 2018, the *Wall Street Journal* published an article entitled "Billionaire Behind LaCroix Accused of Improper Touching by Two Pilots."  The article reported, in part:

> Two pilots have filed lawsuits alleging sexual harassment by the billionaire behind LaCroix sparkling water, claiming 82-year-old Nick A. Caporella inappropriately touched them on multiple trips while they were flying with him in the cockpit of his business jet.
>
> The allegations by the former employees, both men, were made in lawsuits filed in the past two years in Florida and name both the

chief executive and National Beverage Corp. as defendants. Mr. Caporella is the chairman, chief executive and controlling shareholder of National Beverage, which has a market value of $5 billion, thanks to surging LaCroix sales.

Mr. Caporella, a rare CEO who also pilots the corporate jet, and the company have denied the allegations in court documents. *The suits claim the unwanted touching occurred on more than 30 trips from 2014 to 2016.*

\* \* \*

One lawsuit was filed by pilot Terence Huenefeld and his wife. Mr. Huenefeld, who spent about five months working for Mr. Caporella, accused the CEO of unwanted touching on 18 flights between March and July 2016, according to court documents.

The lawsuit alleged Mr. Caporella engaged in "repeated unjustified, unwarranted and uninvited grabbing, rubbing and groping of Terry's leg in a sexual manner, reaching up towards Terry's sexual organs."

\* \* \*

The second pilot, Vincent Citrullo, alleged in his lawsuit *a similar pattern of behavior* during more than a year flying alongside Mr. Caporella. The lawsuit claims that on 14 flights from March 2014 to July 2015, Mr. Caporella engaged in unwanted touching, including grabbing Mr. Citrullo under his armpit, under his thigh and moving his right hand up Mr. Citrullo's left leg towards his genitals.

Reached by phone Tuesday, *Mr. Citrullo said he stands by his allegations "100%. It was definitely inappropriate."*

153.   On this news, National Beverage's share price fell $2.90, or 2.64%, over the following two trading days, closing at $107.04 on July 6, 2018.

154.   On September 6, 2018, National Beverage filed its quarterly report on Form 10-Q for the period ended July 28, 2018.  National Beverage reported the following results comparing three month periods year-over-year:

Three Months Ended July 28, 2018 (first quarter of fiscal 2019) compared to Three Months Ended July 29, 2017 (first quarter of fiscal 2018)

Net sales for the first quarter of fiscal 2019 increased 12.6% to $292.6 million compared to $259.8 million for the first quarter of fiscal 2018. The increase in sales resulted primarily from a 10.4% increase in case volume and, to a lesser extent, a higher average selling price. The volume increase includes 29.1% growth of our Power+ Brands, partially offset by a decline in Carbonated Soft Drinks. The Company discontinued its lower-margin, private-label carbonated soft drink business in the third quarter of Fiscal 2018, allowing future performance to be more focused on brand equity appreciation. Average selling price per case increased 3.8% due to changes in product mix.

Gross profit for the first quarter of fiscal 2019 increased 10.7% to $115.7 million compared to $104.5 million for the first quarter of fiscal 2018. The increase in gross profit is due to increased volume and growth in higher margin Power+ Brands. The cost of sales per case increased 2.1% primarily due to higher aluminum and freight costs. As a result, the gross margin was 39.5% compared to 40.2% for the first quarter of fiscal 2018.

155.    In quarterly report filed September 6, 2018 for the period ended July 28, 2018,

National Beverage announced the following results comparing six month periods year-over-year:

Three Months Ended July 28, 2018 (first quarter of fiscal 2019) compared to Three Months Ended July 29, 2017 (first quarter of fiscal 2018).
Net sales for the first quarter of fiscal 2019 increased 12.6% to $292.6 million compared to $259.8 million for the first quarter of fiscal 2018. The increase in sales resulted primarily from a 10.4% increase in case volume and, to a lesser extent, a higher average selling price. The volume increase includes 29.1% growth of our Power+ Brands, partially offset by a decline in Carbonated Soft Drinks. The Company discontinued its lower-margin, private-label carbonated soft drink business in the third quarter of Fiscal 2018, allowing future performance to be more focused on brand equity appreciation. Average selling price per case increased 3.8% due to changes in product mix.

Gross profit for the first quarter of fiscal 2019 increased 10.7% to $115.7 million compared to $104.5 million for the first quarter of fiscal 2018. The increase in gross profit is due to increased volume and growth in higher margin Power+ Brands. The cost of sales per case increased 2.1% primarily due to higher aluminum and freight costs. As a result, the gross margin was 39.5% compared to 40.2%

for the first quarter of fiscal 2018.

156.     The September 6, 2018 10-Q was signed by Defendant Bracken and contained

signed certifications pursuant to SOX by Defendants Caporella and Bracken, stating that:

> Based on my knowledge, this report does not contain any untrue
> statement of a material fact or omit to state a material fact necessary
> to make the statements made, in light of the circumstances under
> which such statements were made, not misleading with respect to
> the period covered by this report; [and]
>
> Based on my knowledge, the financial statements, and other
> financial information included in this report, fairly present in all
> material respects the financial condition, results of operations and
> cash flows of the registrant as of, and for, the periods presented in
> this report …

157.     On September 6, 2018, National Beverage issued a press release announcing its

financial and operating results for the period ended July 28, 2018.

158.     In the September 6, 2018 10-Q and September 6, 2018 press release, Defendants

made materially false and misleading statements regarding the Company's business, operational

and compliance policies. Specifically, Defendants made false and/or misleading statements and/or

failed to disclose that: (i) National Beverage's sales claims and the supposed underlying

"proprietary techniques" lacked a verifiable basis and were not important metrics used to

determine sales; (ii) Natural Beverage financial statements failed to comply with GAAP, primarily

due to failure to make sufficient disclosures relating to the concentration of the Company's

revenues in LaCroix; and (iii) as a result, National Beverage's public statements were materially

false and misleading at all relevant times.

159.     On October 1, 2018, a consumer class action was filed in the State of Illinois against

National Beverage, alleging that La Croix was not "all natural" as the Company had previously

told the investing public.

160.    The Company issued a press release on the same day, October 1, purporting to refute the allegations about non-natural ingredients, stating that "[a]ll essences contained in LaCroix are certified by our suppliers to be 100% natural[,]" and claiming that "all the flavor essences in LaCroix are natural."

161.    In the October 1, 2018 press release, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that LaCroix was not 100% natural as the Company had claimed.

162.    On October 5, 2018, the Company issued a press release purporting to refute the allegations about non-natural ingredients, stating, in part, "that LaCroix sparkling waters are comprised of natural ingredients. There are no synthetic ingredients in LaCroix" and that "[a]ll essences contained in LaCroix are certified by our suppliers to be 100% natural …. 'There are neither sugars nor artificial ingredients contained in, nor added to, our LaCroix products. All of our ingredients are certified as natural.'"

163.    On October 5, 2018, the Company issued a statement refuting the allegations about non-natural ingredients.

164.    Analysts took a "wait and see" approach with respect to these allegations.  For example, October 8, 2018 Sesquehanna issued a report stating, "We are not factoring a discount for the recent lawsuit questioning the company's claims of natural ingredients (the company has refuted the allegations), and the potential impact on consumers' perceptions. We will monitor sales trends and the ensuing discussion in social media, but for now we are comforted by this article in Popular Science: https://www.popsci.com/lacroix-lawsuit-natural-synthetic-flavors."

165.    On October 12, 2018, the Company issued yet another statement purporting to

refute the allegations about non-natural ingredients, stating in part that "[o]ur LaCroix is made with natural ingredients magnified through love and caring. I get a feeling of inner peace; a feeling that my LaCroix is made with *'Innocent'* avowed on it. I love my LaCroix – it is an excellent product – doesn't our *Innocent* claim mean anything?"; "[n]aturally Essenced is not a marketing ploy, but rather a core product element!"; and "[o]ur Cult, our Consumer, our Love and our *LaCroix* are . . . *Genuinely Natural!"*

166. On October 18, 2018, the Company issued another statement purporting to refute the allegations about non-natural ingredients. The Company stated,

> Our innocence was severely tested these last few weeks with critics using cruel and heartless descriptions that tore at our hearts with shameless fabrications resulting in hundreds of millions of dollars of investor losses by their now proven false allegations. Is our moral code of justice, 'Innocent Until Proven Guilty', a once honored and revered dogma, now synthetic? In business today, is there protection for the innocent? It is unfortunate we live in a time when unscrupulous and misleading allegations can be made with complete disregard for the reputation, credibility and integrity of a person, company or brand.

167. In the October 18, 2018 press release, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that LaCroix was not 100% natural as the Company had claimed.

168. The statements made by the Company on October 5 (¶¶162-163), October 12 (¶165) and October 18, 2018 (¶¶ 166-167) were materially misleading because they omitted to relay to the market the risk of less consumption of LaCroix these allegations would have and, given the magnitude of the Company's concentration of revenues in LaCroix, the impact this would have on the Company overall.

169. On October 30, 2018, the risk of consumers consuming less La Croix materialized.

A Dow Jones article, entitled "LaCroix Loses Fizz After Lawsuit-Market Talk" disclosed results from a survey that 28% of La Croix drinkers consume the product because it is natural. Since the lawsuit was filed, sales of LaCroix dropped 3%. As the article stated:

> 14:25 ET - LaCroix seltzer sales dropped 3% in the two weeks ended Oct 21 after a lawsuit against manufacturer National Beverage Corp alleged that the bubbly beverage doesn't contain all natural ingredients as advertised, according to a Susquehanna analysis of IRI data. National Beverage has denied the allegations as "shameless fabrications" and on Sunday took a full-page ad in USA Today declaring LaCroix "Naturally Truthful." Some 28% of LaCroix consumers drink it because it is natural, according to a Susquehanna survey. Shares are down 2.8% at $97.79, after trading as high as $127 a share in early September. (jennifer.maloney@wsj.com; @maloneyfiles)

170.    Upon this news, the stock plummeted another 4.9%, falling from $100.60 on October 29, 2018 to close at $95.89 on October 30, 2018 on high trading volume.

171.    The impact of the Defendants' failure to comply with GAAP was also fully realized here where a drop in LaCroix sales caused the market to sell off National Beverage's stock. The stock plummeted when the market learned that the concentration of LaCroix in sales and growth was negatively impacted, further materializing the risk of omitting this concentration from the Company's financials during the Class Period.

172.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages upon the materialization of the risks undisclosed during the Class Period, as well as the disclosures of the wrongdoing.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

173.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired National Beverage securities during the Class Period (the "Class"); and were damaged

upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

174.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, National Beverage securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by National Beverage or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

175.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

176.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

177.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of National Beverage;

- whether the Individual Defendants caused National Beverage to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of National Beverage securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

178.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

179.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- National Beverage  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold National Beverage securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

180.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

181.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

182.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

183.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

184.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of National Beverage

securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire National Beverage securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

185.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for National Beverage securities.   Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about National Beverage's finances and business prospects.

186.    By virtue of their positions at National Beverage , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.   Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.   In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

187.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.   As the senior managers

and/or directors of National Beverage, the Individual Defendants had knowledge of the details of National Beverage's internal affairs.

188.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of National Beverage.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to National Beverage's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of National Beverage securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning National Beverage's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired National Beverage securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

189.    During the Class Period, National Beverage securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of National Beverage securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and

the Class, the true value of National Beverage securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of National Beverage securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

190.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

191.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

192.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

193.    During the Class Period, the Individual Defendants participated in the operation and management of National Beverage, and conducted and participated, directly and indirectly, in the conduct of National Beverage's business affairs.  Because of their senior positions, they knew the adverse non-public information about National Beverage's misstatement of income and expenses and false financial statements.

194.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to National

Beverage's financial condition and results of operations, and to correct promptly any public statements issued by National Beverage which had become materially false or misleading.

195.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which National Beverage disseminated in the marketplace during the Class Period concerning National Beverage's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause National Beverage to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of National Beverage within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of National Beverage securities.

196.    Each of the Individual Defendants, therefore, acted as a controlling person of National Beverage.  By reason of their senior management positions and/or being directors of National Beverage, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, National Beverage to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of National Beverage and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

197.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by National Beverage.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  November 2, 2018                        Respectfully submitted,

HEDIN HALL LLP

By: /s/ Frank S. Hedin
        Frank S. Hedin

FRANK S. HEDIN (FBN 109698)
DAVID W. HALL
1395 Brickell Ave, Suite 900
Miami, Florida 33131
Telephone: (305) 357-2107
Facsimile:  (305) 200-8801
E-mail: fhedin@hedinhall.com
E-mail: dhall@hedinhall.com

POMERANTZ LLP
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom

Leigh Handelman Smollar
Louis Ludwig
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**HOLZER & HOLZER, LLC**
Corey D. Holzer
1200 Ashwood Parkway, Suite 410
Atlanta, GA  30338
Telephone:  (770) 392-0090
Facsimile:  (770) 392-0029
Email: cholzer@holzerlaw.com

*Attorneys for Plaintiff*