**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 18-cv-61631-KMM

THOMAS W. LUCZAK,

      Plaintiff,

v.

NATIONAL BEVERAGE CORPORATION,
NICK A. CAPORELLA, and GEORGE R.
BRACKEN,

      Defendants.

_____/

ORDER ON MOTION TO DISMISS

THIS CAUSE came before the Court upon Defendants National Beverage Corporation ("National Beverage"), Nick A. Caporella ("Caporella"), and George R. Bracken's ("Bracken," and collectively, "Defendants") Motion to Dismiss ("Mot.") (ECF No. 26) Plaintiff Thomas W. Luczak's ("Plaintiff") Amended Class Action Complaint ("Am. Compl.") (ECF No. 25).  Plaintiff responded ("Resp.") (ECF No. 32) and Defendants replied ("Reply") (ECF No. 33).  The motion is now ripe for review.

**I.      BACKGROUND**

National Beverage is a publicly owned, family-controlled, and Fort Lauderdale-based company founded by Caporella that "develops, produces, markets, and sells a portfolio of flavored beverage products," including sparkling waters LaCroix and Shasta.[1]  Am. Compl. ¶¶ 2–3, 25, 194. Caporella, the CEO and Chairman of National Beverage, controls 73.5% of the company's common

---

[1]  National Beverage's stock trades on the NASDAQ under the ticker symbol "FIZZ."  Am. Compl. ¶ 3.

stock. *Id.* ¶¶ 3, 25.  Bracken is National Beverage's Executive Vice President of Finance. *Id.* ¶ 26. Caporella and Bracken are both authorized to (1) control the contents of National Beverage's SEC filings, press releases, and other market communications; (2) prevent any communication from being issued; and (3) correct any misstatement. *Id.* ¶ 28.

Plaintiff, individually and on behalf of all others similarly situated, brings the instant securities class action against Defendants pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. *Id.* ¶ 1.  Plaintiff alleges that during the designated class period of July 17, 2014 through October 30, 2018 (the "Class Period"), he acquired National Beverage stock at artificially inflated prices due to repeated material misrepresentations and omissions in National Beverage's publicly issued statements, and that these misrepresentations and omissions caused Plaintiff and other class members "significant losses and damages." *Id.* ¶¶ 1, 18, 23.  Specifically, Plaintiff identifies the following four categories of statements or omissions that eventually led to a "precipitous decline" in the value of National Beverage's securities:

A.    The "All Natural" Claim

Defendants marketed, labeled, and publicly represented to investors that LaCroix is "all natural," "100% natural," or "100% naturally essenced." *Id.* ¶¶ 6, 30, 98.  Defendants touted the "all natural" claim to get a competitive edge over competing sparkling water products. *Id.* ¶ 6. According to Plaintiff, thousands of customers choose LaCroix over competitor brands because of the assurance of an "all natural" product. *Id.* ¶ 30.  On October 1, 2018, a consumer class action was filed in Illinois state court against National Beverage, alleging that LaCroix was not "all natural," as National Beverage had publicly asserted. *Id.* ¶ 159.  That same day, National Beverage issued a press release stating: "[a]ll essences contained in LaCroix are certified by our suppliers to be 100% natural." *Id.* ¶ 160.  Four days later, National Beverage issued another press release

2

asserting that LaCroix is "comprised of natural ingredients," and that "there are neither sugars nor artificial ingredients contained in, nor added to, our LaCroix products. All of our ingredients are certified as natural." *Id.* ¶ 162. On October 30, 2018, Dow Jones published a news report entitled, "LaCroix Loses Fizz After Lawsuit-Market Talk," which disclosed results from a survey stating that 28% of LaCroix drinkers consume the product because it is "natural," and that since the filing of the Illinois action, LaCroix sales dropped 3%. *Id.* ¶ 169. Following the Dow Jones report, LaCroix tumbled an additional 4.9%, falling from a close of $100.60 on October 29, 2018 to a close of $95.89 on October 30, 2018. *Id.* ¶ 170.

Plaintiff alleges that LaCroix is not, in fact, "all natural" as Defendants claim and that any public representation by Defendants to the contrary is materially misleading. *Id.* ¶¶ 167–168. Plaintiff further alleges that Defendants' failure to disclose that LaCroix is purportedly not "all natural" caused the resulting drop in stock price following the publication of the Dow Jones article. *Id.* ¶¶ 169–170.

B.     Revenue Concentration

LaCroix is National Beverage's "largest product line by far." *Id.* ¶ 101. LaCroix also generated the most growth in National Beverage's share price. *Id.* ¶ 31. On May 4, 2017, Laurent Grandet ("Grandet"), a market analyst for international investment bank Credit Suisse, stated that while LaCroix sales grew by 60%, the remainder of National Beverage's product portfolio grew by only 2%, and that by the first quarter of 2018, LaCroix would account for 48% of National Beverage's total sales. *Id.* ¶¶ 31–32. On October 23, 2017, another analyst estimated that LaCroix could comprise as much as 66% of National Beverage sales, adding that "for valuation and investment purposes, it would help to know how big LaCroix is" as a share of National Beverage's entire portfolio. *Id.* ¶ 115. On December 8, 2017, Grandet assigned an "underperform" rating to

National Beverage's stock, stating that National Beverage's business was driven "almost entirely" by LaCroix's success, the growth trajectory of which was slowing. *Id.* ¶ 122.

Plaintiff alleges that National Beverage's failure to disclose the total share of sales or profits attributable to LaCroix violated Generally Accepted Accounting Principles ("GAAP"),[2] which purportedly require a company to disclose any "vulnerability from its outsized concentration of revenue" in a particular product. *Id.* ¶ 34. Plaintiff further alleges that Defendants' failure to comply with GAAP "caused a downturn in stock price" because analysts found National Beverage's financials "opaque" and were thus unable to accurately forecast or evaluate National Beverage's true value or calculate any risk stemming from the concentration of National Beverage's profits in LaCroix. *Id.* ¶¶ 46, 122.

C.    VPO/VPC

On May 4, 2017, in response to National Beverage receiving a "sell" rating from market analyst Anthony Vendetti, Defendants issued a press release in which Caporella stated that National Beverage "employs methods that no other company does in this area–VPO (velocity per outlet) and VPC (velocity per capita)."[3] *Id.* ¶¶ 80–81. Caporella added that National Beverage:

> "[U]tilize[s] two proprietary techniques to magnify these measures and this creates growth never before thought possible. Unique to [National Beverage] is creating velocity per capita though proven velocity predictors. Retailers are amazed by

---

[2]   GAAP "comprise a set of basic accounting principles pertaining to business entities" that "establish guidelines for measuring, recording, and classifying a business entity's transactions." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1200 n.3 (11th Cir. 2001).

[3]   National Beverage would later define VPO as a metric used to "establish goals for certain customers," identify poor performing stores, and "give customers better insight into their consumers." Am. Compl. ¶ 136. According to National Beverage, the VPO metric is "calculated by dividing the number of units sold by a given customer during a specified time period by the number of outlets stocking the product." *Id.* VPC metrics, meanwhile, are used "primarily to quantify the average number of beverages by category that people consume each year in the United States." *Id.* According to National Beverage, VPC "is calculated by dividing the number of units sold in a given geographic area by the population of the area." *Id.*

these methods and find before and after changes so dynamic that they demand we afford them the use of these methods as frequently as possible."

*Id.*  The following day, National Beverage issued another press release, in which Caporella stated that "[o]ur impressive VPO calculator . . . reflected on the cover of our fiscal year 2015 Proxy is flashing solid green numbers as we bring FY2017 to a close." *Id.* ¶ 89.  On June 2, 2017, National Beverage again issued a press release stating that LaCroix "is setting the pace for retailer shelf reallocation while fueling a new standard for VPO (velocity per outlet) and VPC (velocity per capita).  The month of May is the engine for what appears to [be the] start [of] a great summer and another great year for our . . . investors[.]" *Id.* ¶ 91.

On January 26, 2018, the United States Securities and Exchange Commission ("SEC") wrote a letter to National Beverage regarding National Beverage and Caporella's references to VPO and VPC in the above-mentioned press releases.  *Id.* ¶ 126.  Specifically, the SEC requested information on how National Beverage used the VPO and VPC metrics in managing its business.  *Id.*  On February 23, 2018, National Beverage responded that its references to VPO and VPC "characterize[d] the entrepreneurial spirit of [National Beverage] and [Caporella]," and that while these metrics "are used to establish goals for certain customers," they "are not utilized to manage the overall executional side of our business." *Id.* ¶ 127.  National Beverage added that it did "not believe that [its] comments relative to VPO/VPC dynamics require explanation as [VPO and VPC] are . . . not key performance indicators that would give readers a view of the [c]ompany through the 'eyes of the management.'" *Id.*

On March 23, 2018, the SEC wrote another letter (the "March 23 Letter") to National Beverage, requesting that National Beverage "reconcile[]" (1) its contention that VPO and VPC are "not key performance indicators" used by National Beverage management with (2) its public

representations that the VPO and VPC help create "growth never before thought possible" and that National Beverage's "impressive VPO calculator . . . is flashing solid green numbers as we bring FY2017 to a close." *Id.* ¶ 134.

On April 24, 2018, National Beverage responded to the SEC, explaining what each metric measures and how it is calculated. *Id.* ¶ 136. National Beverage also stated that "[a]lthough VPO and VPC are components in marketing and evaluating [sales] performance . . . the data underlying these metrics is proprietary" and thus cannot be provided to the SEC. *Id.* On May 14, 2018, the SEC told National Beverage that it had completed its inquiry into the matter. *Id.* ¶ 137.

On June 26, 2018, the Wall Street Journal ("WSJ") published an article (the "June 26 Article") titled: "The SEC Has Had Its Own Questions About LaCroix," which effectively summarized the above-mentioned exchanges between National Beverage and the SEC. *Id.* ¶ 138. The day after the WSJ published its story, National Beverage's share price fell by 8.87%, to close at $100.19. *Id.* ¶ 139.

Plaintiff contends that following the article's publication, the market "fully realized that" National Beverage's claims about VPO and VPC "creat[ing] growth never before though possible" and "flashing solid green numbers" were false because neither the VPO and VPC measures were important or material to investors. *Id.* ¶ 139.

D.      Sexual Harassment

On July 3, 2018, the WSJ published an article (the "July 3 Article") titled: "Billionaire Behind LaCroix Accused of Improper Touching by Two Pilots." *Id.* ¶ 152. The article reported that Terence Huenfeld and Vincent Citrullo, two corporate jet pilots formerly employed by National Beverage, filed lawsuits against Caporella and National Beverage for "unwanted touching" by

Caporella on numerous occasions from 2014 to 2016.  *Id.*  Over the next several days, National

Beverage's share price fell by 2.64% to close at $107.04 on July 6, 2018.  *Id.* ¶ 153.

From 2014 through 2016, National Beverage's 10-K filings–signed and certified by

Caporella and Bracken pursuant to the Sarbanes-Oxley Act of 2002–advised investors that its Code

of Ethics was available on the National Beverage website.  *Id.* ¶¶ 69–76.  National Beverage's Code

of Ethics "absolutely" prohibited "[a]ny type of harassment, whether of a racial, sexual, ethnic, or

other nature."  *Id.* ¶ 69.  Plaintiff alleges that National Beverage's purported lack of any disciplinary

action against Caporella violated the Code of Ethics' "absolute[]" prohibition on sexual harassment

and thus made the 10-K filings at issue materially false or misleading.  *Id.* ¶ 77.

Defendants now move to dismiss the Amended Complaint pursuant to Fed. Rs. Civ. P.

12(b)(6) and 9(b), arguing that Plaintiff fails to establish standing and adequately allege falsity,

scienter, and loss causation for each of the above-mentioned statements.  *See generally* Mot.

## II.    STANDARDS OF REVIEW

### A.    Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

as true and construed in the light most favorable to the plaintiff, to state a claim for relief that is

plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550

U.S. 544, 570 (2007)).  However, "conclusory allegations, unwarranted deductions of fact or legal

conclusions masquerading as facts will not prevent dismissal."  *Oxford Asset Mgmt., Ltd. v. Jaharis*,

297 F.3d 1182, 1188 (11th Cir. 2002).

### B.    Section 10(b) and SEC Rule 10b-5

"To state a claim for securities fraud under Rule 10b-5, a plaintiff must allege the following

elements: '(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection

7

with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection' between the misrepresentation or omission and the loss, commonly called 'loss causation.'" *Carvelli v. Ocwen Fin. Corp.*, No. 18-12250, 2019 WL 3819305, at *4 (11th Cir. Aug. 15, 2019) (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008)).

The Private Securities Litigation Reform Act (the "PSLRA") imposes two additional requirements in securities fraud cases. First, the PSLRA mandates that a securities fraud class action complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *See Mizzaro*, 544 F.3d at 1238 (quoting 15 U.S.C. § 78u-4(b)(1)(B)). Second, the PSLRA raises the standard for pleading scienter. Specifically, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).

Failure to meet any of the above standards "will result in a complaint's dismissal." *See Carvelli*, 2019 WL 3819305, at *4 (internal citation omitted).

## III.   DISCUSSION

### A.   Standing

Defendants argue that Plaintiff has insufficiently alleged injury in fact–and thus a lack of standing to proceed in federal court–because Plaintiff "apparently sold all of the shares he purchased during the [C]lass [P]eriod before any supposed fraud was revealed." Mot. at 26. In response,

8

Plaintiff argues that he has standing because he traded National Beverage stock within a reasonable time after Defendants issued allegedly false statements.  Resp. at 25.

"A plaintiff cannot include class action allegations in a complaint and expect to be relieved of personally meeting the requirements of constitutional standing, even if the persons described in the class definition would have standing themselves to sue." *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) (internal quotation marks omitted); *Bowen v. First Family Fin. Servs., Inc.*, 233 F.3d 1331, 1339 (11th Cir. 2000) ("The fact that this suit was brought as a class action does not affect the plaintiffs' burden of showing that they individually satisfy the constitutional requirements of standing.").  A class action plaintiff must show that he or she has "(1) suffered an injury in fact, that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

Here, Plaintiff has sufficiently alleged an injury in fact.  Plaintiff alleges a decrease in the value of his National Beverage shares caused by Defendants' misleading statements in June and December of 2017 related to National Beverage's sales growth, corporate governance, and transparency, and that his loss can be redressed by a favorable ruling in his favor.  *See* Am. Compl. ¶¶ 5, 8; Stock Purchase Sheet (ECF No. 14–2) at 4 (listing Plaintiff's purchases and sales of National Beverage stock from May 31, 2017 until December 28, 2017); Loss Chart (ECF No. 14–3) at 2 (suggesting that Plaintiff lost approximately $600,000 in value after selling National Beverage shares).  Moreover, Plaintiff plausibly alleges that he bought and sold "shares of the stock in question within a reasonable period of time after the allegedly fraudulent conduct occurred." *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1267 (11th Cir. 2006).  This suffices to establish

9

standing.[4]  *See Thorpe v. Walter Inv. Mgmt., Corp.*, Case No. 1:14–cv–20880–UU, 2016 WL 4006661, at *7 n.5 (S.D. Fla. Mar. 16, 2016) (holding that the plaintiffs "clearly" had standing to bring Rule 10b-5 claim when they sufficiently alleged: (1) a decrease in stock value, (2) caused by the defendants' misleading statements, and (3) that the loss could be remedied by a favorable ruling in the action); *Barr v. Matria Healthcare, Inc.*, 324 F. Supp. 2d 1369, 1376–77 (N.D. Ga. 2004) (holding that because the plaintiff suffered an out-of-pocket loss, he had standing to sue despite the fact that he sold his stock prior to the truth of the alleged misstatements coming to light).

    B.    <u>Violations of § 10(b) and Rule 10b-5</u>

Defendants next argue that Plaintiff fails to sufficiently allege a material misrepresentation or omissions, scienter, and loss causation for each of the statements above.  The Court will address each statement in turn.

    *1.*    *The "All Natural" Claim*

Defendants claim that the "all natural" ingredient claim fails to adequately allege falsity because it is entirely based on allegations made in the Illinois state court action.  Mot. at 11–12. Defendants further argue that any decline in share price following the reporting of the Illinois state action in no way suggests the falsity of the claim.  *Id.* at 12.  In response, Plaintiff argues that after the filing of the Illinois action, Defendants were obligated to issue corrective disclosures regarding

---

[4]  To the extent Defendants argue that Plaintiff must show loss causation to garner standing, *see* Mot. at 19, the Court disagrees.  *See Plymouth Cty. Ret. Sys. v. Carter's Inc.*, CIVIL ACTION NO. 1:08-cv-02940-JOF, 2011 WL 13124501, at *10 (N.D. Ga. Mar. 17, 2011) (holding that loss causation "need not be sufficiently alleged for a [10b-5] plaintiff to successfully assert standing," and stating that "although there are few cases addressing standing in securities claims in a similar context, the Eleventh Circuit has made it clear in other contexts that 'no authority even remotely suggests that proximate causation applies to the doctrine of standing.'") (citing *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003)).

its "all natural" claims by explaining that that it "relie[d] on [its] suppliers to certify the accuracy of its claims."  Resp. at 16–17.

"Rule 10b-5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'"  *FindWhat Inv. Grp. v. Findwhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (citing 17 C.F.R. § 240.10b-5(b)).  "By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead."  *Id.*  "A statement is misleading if in the light of the facts existing at the time of the statement[,] a reasonable investor, in the exercise of due care, would have been misled by it."  *Id.*  "Thus, the appropriate primary inquiry is into the meaning of the statement to the reasonable investor and its relationship to truth."  *Id.*  Here, Plaintiff fails to sufficiently allege that the "all natural" representation is materially false.

First, Plaintiff cannot merely crib allegations from a complaint in another jurisdiction as the sole source of support for his claims here.  *See Pace v. Quintanilla*, No. SA CV 14–2067–DOC (RNBx)., 2015 WL 652719, at *7 (C.D. Cal. Feb. 13, 2015) ("An attorney cannot rely solely on another complaint as the sole basis for his or her allegations."); *Tucker v. Am. Int'l Grp.*. No. 3:09–CV–1499 (CSH)., 2012 WL 685461, at *4 (D. Conn. Mar. 2, 2012) ("[I]t is hornbook law that unproven, non-adjudicated allegations are not evidence."); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (C.D. Cal. 2008) (striking allegations within a complaint that were taken from a related SEC complaint where plaintiffs' counsel relied solely on the SEC complaint and failed to conduct an independent investigation into the SEC's allegations).

Second, National Beverage's alleged reliance on its suppliers' certifications that LaCroix's ingredients are all natural does not necessarily render National Beverage's "all natural" claim false.

*See FindWhat*, 658 F.3d at 1305 (stating that defendants need not disclose facts that are "interesting, market-wise," but otherwise do not "neutralize only the natural and normal implication of its statements"); *McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1304 (S.D. Fla. 2015) (holding that a failure to disclose that the defendant's products were "adulterated and misbranded" is not actionable where the plaintiffs failed to present any evidence suggesting that the products were, in fact, "adulterated and misbranded" at the time of the statement's issuance). Here, National Beverage's reliance on its suppliers' certifications in no way "neutralize[s]" its previous contentions that LaCroix is all natural. *See FindWhat*, 658 F.3d at 1305. Moreover, Plaintiff fails to present any evidence beyond unproven allegations within a separate lawsuit that LaCroix is not, in fact, "all natural."

Accordingly, the Court finds this statement nonactionable. *See Iradimed*, 111 F. Supp. at 1304. Defendants' Motion to Dismiss the Amended Complaint as to Plaintiff's "all natural" statement is therefore GRANTED.[5]

### 2. Revenue Concentration

Defendants next argue that the market was already aware of LaCroix's dominance within National Beverage's portfolio, so any omission of the exact amount or percentage of LaCroix sales relative to other National Beverage products did not make National Beverage's financial statements materially false. Mot. at 16–17. Defendants further argue that Plaintiff fails to establish scienter and loss causation for the revenue concentration omission. *Id.* at 17–18, 24. In response, Plaintiff argues that GAAP required National Beverage to disclose any risk relating to revenue concentration

---

[5] Because the Court finds the "all natural" statement nonactionable, the Court need not address Defendants' remaining arguments regarding scienter and loss causation. *See Iradimed*, 111 F. Supp. 3d at 1304 (dismissing claim after finding statement nonactionable for lack of falsity).

when such concentration could have caused a "near-term severe impact" on the company.  Resp. at 13.

The Court need not decide whether National Beverage's lack of specificity regarding LaCroix's revenue concentration amounted to a material omission or caused a loss in the value of National Beverage stock because Plaintiff fails to sufficiently allege scienter.  *See Brophy v. Jiangbo Pharm., Inc.*, 781 F.3d 1296, 1302 (11th Cir. 2015) (affirming dismissal of § 10(b) claim for lack of scienter "[e]ven assuming *arguendo* that the investors have sufficiently pled" remaining elements).[6]

To establish scienter, a plaintiff must show a defendant's (1) intent to deceive, manipulate, or defraud or (2) severe recklessness.  *See Mizzaro*, 544 F.3d at 1238 (internal citation marks and quotations omitted).  Importantly, "violations of GAAP, without more, may establish negligence, but can never establish scienter."  *See In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1165 (S.D. Fla. 2004) (internal citations omitted); *Ziemba*, 256 F.3d at 1208–09.  Further, Plaintiff must show a "strong inference of scienter for *each defendant* with respect to each violation."  *See McClain*, 111 F. Supp. 3d at 1306 (internal citation omitted) (emphasis added).

Here, National Beverage repeatedly disclosed to the SEC that LaCroix was its "strategically largest," "most significant," and "dominant" brand.  *See* National Beverage 2016 10-K (ECF No. 26–10) at 5; National Beverage 2017 10-K (ECF No. 26–5) at 6; National Beverage 2018 10-K (ECF No. 26–6) at 7.[7]  Plaintiff provides no evidence to suggest that there was ever any market

---

[6]  Although the Court found the "all natural" statement nonactionable as a matter of law, the Court need not address whether the revenue concentration omission is materially misleading because Plaintiff's failure to adequately allege scienter dooms the claim entirely.  *See Brophy*, 781 F.3d at 1302.

[7]  The Court takes judicial notice of any documents filed by National Beverage with the SEC for the purpose of adjudicating this Motion.  *See In re Altisource Portfolio Sols, S.A. Sec. Litig.*, Case

confusion about whether LaCroix constituted a disproportionate share of National Beverage's revenues. In fact, Plaintiff *alleges* that analysts had already estimated that "throughout the class period," LaCroix accounted anywhere from one half to two-thirds of National Beverage's entire portfolio, a "huge concentration." Am. Compl. ¶¶ 32, 34 115, 122. Plaintiff thus fails to present any evidence–beyond a potential GAAP violation–that Defendants acted with severe recklessness in failing to disclose the precise concentration of LaCroix revenues within National Beverage's product portfolio. *See Sportsline.com*, 366 F. Supp. 2d at 1165 (stating that alleged GAAP violations "provide evidence of scienter only when accompanied by *additional* facts and circumstances that raise an inference of fraudulent intent") (emphasis added); *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1279 (S.D. Fla. 2017) (holding that the plaintiffs' failure to allege "the existence of any report, document, email, or statement that, if true, suggests that the defendants knew or were reckless not to know" of the falsity of the statement at issue precluded a finding of scienter); *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1113 (10th Cir. 2015) (holding that scienter insufficiently pled when the plaintiff failed to allege any "particularized facts"–other than GAAP violations–suggesting that the defendants knew or recklessly disregarded a material fact or omission).

Moreover, Plaintiff entirely fails to detail Caporella or Bracken's roles in omitting to specify LaCroix's exact revenue concentration and whether either Defendant benefitted from these omissions. *See Mulvaney v. GEO Grp., Inc.*, 237 F. Supp. 3d 1308, 1323–24 (S.D. Fla. 2017) (holding that plaintiffs failed to adequately plead scienter when they did not allege that the individual

---

14-81156 CIV-WPD, 2015 WL 12001262, at *2 (S.D. Fla. Sept. 4, 2015) ("[T]he Eleventh Circuit has expressly held that a court may judicially notice relevant documents legally required by, and publicly filed with, the [SEC]."); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) (noting that the "usual rules for considering 12(b)(6) motions are [] bent to permit consideration of an allegedly fraudulent statement in context.").

defendants sold securities during the class period or otherwise benefitted from the allegedly misleading statements).  To the extent Plaintiff argues that Caporella or Bracken must have known of any concentration-related issue because of their senior executive status within the company, this Court has repeatedly held that "merely holding a position of power does not lead to an inference of scienter without specific allegations of the [i]ndividual [d]efendants' role in the fraud." *See id.* at 1324; *Owl Creek I, L.P. v. Ocwen Fin. Corp.*, Case No. 18-80506-CIV-BLOOM/REINHART, 2018 WL 4844019, at *9 (S.D. Fla. Oct. 4, 2018) (holding that allegation that individual defendant "must have" known of lack of compliance with regulatory standards insufficiently alleges scienter when the complaint fails to "reference any specific report or statement that was produced to" that defendant regarding the lack of compliance) (internal citations omitted).

Finally, even after conducting a "holistic review" of all of the allegations in the Amended Complaint, Plaintiff fails to convince the Court that an inference of scienter regarding Defendants' alleged revenue concentration omission is "at least as compelling as any opposing inference one could draw from the facts alleged." *See Durgin v. Mon*, 415 F. App'x 161, 165 (11th Cir. 2011) (internal citations omitted).  As stated above, National Beverage repeatedly disclosed LaCroix's outsized concentration of the company's total portfolio to the SEC and this concentration was widely known and accepted by market analysts.  Defendants' failure to disclose the *exact* proportion of revenue concentration in LaCroix is therefore not "highly unreasonable or an extreme departure from the standards of ordinary care." *See id.* at 166–67 (holding that plaintiff failed to sufficiently allege scienter when the complaint's allegations were not as compelling as an "any opposing inference of conduct that did not violate § 10(b)," and that "at worst, defendants acted with inexcusable negligence") (internal citation and quotation marks omitted).  Moreover, Plaintiff fails to allege any "red flags that would have alerted" Defendants that their failure to disclose the exact

revenue concentration in LaCroix amounted to a material omission.  *See id.* at 165 (internal citation and quotation marks omitted).

Accordingly, Plaintiff fails to allege sufficient facts that, "taken collectively, give rise to a strong inference of scienter" regarding the revenue concentration omission.  *See id.*  Thus, Defendants' Motion to Dismiss the Amended Complaint as to Plaintiff's revenue concentration claim is GRANTED.

### 3.    *VPO/VPC*

Defendants next argue that Plaintiff fails to sufficiently allege that the VPO/VPC statements were materially misleading and made with scienter.  *See* Mot. at 18–21.  Defendants further argue that Plaintiff fails to plausibly allege loss causation because Defendants' responses to the SEC do not constitute "corrective" disclosures that reveal new facts or otherwise reveal any "actual wrongdoing."  *Id.* at 24–25.  In response, Plaintiff argues that Caporella falsely claimed that VPO and VPC were proprietary to National Beverage, and misled investors by suggesting that VPO and VPC were important metrics to create growth in the company.  Resp. at 8–12.  Plaintiff further argues that Caporella and National Beverage acted with scienter, and that statements at issue caused a drop in the value of National Beverage shares.  *Id.* at 12–13, 18–19, 22–24.

The Court need not decide whether Plaintiff sufficiently alleges a material misstatement or scienter because Plaintiff fails to plausibly allege loss causation.  *See Meyer v. Greene*, 710 F.3d 1189, 1202 (11th Cir. 2013) (affirming dismissal of § 10(b) claim when the plaintiff failed to adequately allege loss causation, regardless of whether the plaintiff sufficiently pled the remaining securities fraud elements); *Sapssov*, 608 F. App'x at 861–864 (failure to adequately allege loss causation dooms claim even when the material misstatement and scienter elements are met).

16

"To show loss causation in a § 10(b) claim, a plaintiff must offer proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." *Meyer*, 710 F.3d at 1195 (internal citation and quotation marks omitted).  Section 10(b) plaintiffs can prove loss causation by: "(1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure–as opposed to other possible depressive factors–that caused at least a 'substantial' amount of the price drop." *See FindWhat*, 658 F.3d at 1311–12.

Plaintiff argues that two public disclosures regarding VPO and VPC constitute "corrective disclosures" demonstrating loss causation: (1) the SEC's March 23 Letter to National Beverage, requesting that the company explain the discrepancy between National Beverage's public statements stressing VPO and VPC's importance and National Beverage's representation to the SEC that these metrics are "not key performance indicators" and (2) the WSJ's June 26 Article, summarizing National Beverage's correspondence with the SEC, which, according to Plaintiff, "provided the market with a full realization that Defendants' claims about the VPO and VPC metrics were false and misleading."  Resp. at 23–24.  Plaintiff alleges that one business day after the SEC issued the March 23 Letter, National Beverage suffered a "statistically significant" drop in share price.  Am. Compl. ¶¶ 10–11, 135.[8]  Moreover, following the WSJ's publication of the June 26 Article, National Beverage's share price fell $9.75, or 8.87%.  *Id.* ¶ 139.

---

[8]  As noted by Defendants, the Amended Complaint is inconsistent as to the amount of the decline, at first stating that it fell by $1.96 from a previous close of $87.65, Am. Compl. ¶ 11, and then claiming that it fell by $4.82 from the same $87.65 close, *id.* ¶ 135.

The Court agrees with Defendant that neither the March 23 Letter nor the June 26 Article are "corrective disclosures" that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *See FindWhat*, 658 F.3d at 1311, 1311 n.28 (adding that because "a corrective disclosure must reveal a previously concealed truth, it obviously must disclose new information, and cannot be merely confirmatory.").

First, the March 23 Letter–noting a discrepancy between National Beverage's various statements to the public and the SEC and then requesting further information to address the discrepancy–does not reveal any "previously concealed truth." *See Sapssov*, 608 F. App'x at 861–864 (holding that the plaintiffs failed to adequately plead loss causation because the revelation of a governmental investigation into the defendant and a related whistleblower case concerning similar conduct did not amount to a corrective disclosure). Although the letter certainly suggests skepticism with National Beverage's prior response to the SEC, it does not constitute either "proof of fraud" or "proof of liability," and otherwise "merely confirm[s]" the SEC's already established doubt of the veracity of the relevant VPC/VPO statements. *See id.* at 863; *FindWhat*, 658 F.3d at 1311 n.28. Plaintiff argues that the March 23 Letter put investors "on notice for the first time that 'the Company was failing to cooperate with the SEC.'" Resp. at 23. But the SEC never accused National Beverage of failing to cooperate. As Plaintiff acknowledges, the SEC merely requested a response to the above-stated inquiry, and National Beverage complied with the request by responding to the inquiry approximately one month later. *See generally* March 23 Letter; Am. Compl ¶ 136. Because the March 23 Letter does not reveal any "previously concealed truth," Plaintiff fails to sufficiently allege that the March 23 Letter constitutes a corrective disclosure that "establishes a causal link" to Plaintiff's stock-value loss. *See Sapssov*, 608 F. App'x at 863 (internal citation omitted).

18

Second, the June 26 Article is not a corrective disclosure because "the mere repackaging of already-public information . . . is simply insufficient to constitute a corrective disclosure."  *See Meyer*, 710 F.3d at 1199 (explaining that if every report "based on already public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst's negative analysis of public filings as a corrective disclosure").  The June 26 Article does not add any commentary, analysis, or information beyond a summary of the already existing correspondence between National Beverage and the SEC.  *See* Am. Compl. ¶ 138.  Accordingly, Plaintiff fails to allege any "new" information within that article that revealed a "previously concealed truth."  *See FindWhat*, 658 F.3d at 1311.

Curiously, Plaintiff appears to argue that the June 26 Article, which merely summarizes the SEC's correspondence with National Beverage regarding VPO and VPC, is based upon information not publicly known prior to the article's publication.  Resp. at 23–24.  However, Plaintiff fails to identify any information mentioned in the article that was not already publicly known.  In fact, Plaintiff *himself* alleges that investors already knew about the March 23 Letter almost immediately after its release.  *See* Am. Compl. ¶¶ 10–11, 134–135; Resp. at 23.  Plaintiff cannot have it both ways.  Plaintiff cannot argue in one breath that the SEC correspondence was publicly absorbed and reflected a decline in National Beverage's share price, and in another that the June 26 Article reflected purely private information, the contents of which Plaintiff now conveniently declines to identify.

Plaintiff finally argues that Defendants "fail to offer any explanation for the market's reaction to what they contend was well-known information."  Resp. at 24.  However, the Eleventh Circuit has made clear that securities fraud *plaintiffs*–not defendants–have the burden of plausibly alleging loss causation under § 10(b), including "eliminating other possible explanations for [a]

price drop." *See FindWhat*, 658 F.3d at 1311–12; *Meyer*, 710 F.3d at 1195 ("To show loss causation . . . *a plaintiff* must offer proof of a causal connection between the misrepresentation and the investment's subsequent decline in value.") (emphasis added); *Sapssov*, 608 F. App'x at 864 (Martin, J., concurring) ("Under our binding precedent in *Meyer*[], plaintiffs must be armed with *proof* of a misrepresentation in order to *plead* securities fraud.") (emphasis in original).

Because Plaintiff fails to sufficiently allege that the March 23 Letter and June 26 Article constitute corrective disclosures that "establish[] a causal link" to Plaintiff's stock-value loss, Plaintiff fails to plausibly allege loss causation. *See Sapssov*, 608 F. App'x at 863 (internal citation omitted). Accordingly, Defendants' Motion to Dismiss the Amended Complaint as to the VPO/VPC statements is GRANTED.

### 4. Sexual Harassment

Defendants finally argue that the allegations of sexual harassment against Caporella: (1) did not render National Beverage's anti-harassment policy within its code of ethics materially misleading; (2) are insufficient to establish scienter; and (3) did not contribute to a loss in stock price following the WSJ's July 3 Article describing the allegations. Mot. at 7–9, 16. In response, Plaintiff argues that the allegations rendered the code of ethics materially misleading; that Defendants acted with scienter by "recklessly or intentionally omitting information of alleged harassment"; and that the July 3 Article is a corrective disclosure for loss causation purposes. Resp. at 14–16, 24. The Court need not decide whether Plaintiff sufficiently alleged any material misstatement or scienter because Plaintiff again fails to plausibly allege loss causation. *See Meyer*, 710 F.3d at 1202.

"[T]he mere repackaging of already-public information . . . is simply insufficient to constitute a corrective disclosure." *See id.* at 1199. As alleged, the July 3 Article presents no "facts

to the market that are . . . publicly revealed for the first time." *See id.* at 1197–98 (report does not constitute corrective disclosure where its "material portions" are "gleaned entirely from public filings and other publicly available information") (internal citations omitted).  For example, Plaintiff alleges that the July 3 Article merely summarizes two lawsuits filed in this Court against Caporella and National Beverage, which alleges, *inter alia*, that Caporella sexually harassed Huenfeld and Citrullo on numerous occasions.  *See* Am. Compl. ¶ 152.  Citrullo told the WSJ that he "stands by his allegations 100%.  [Caporella's conduct] was definitely inappropriate.'" *Id.*  "On this news," Plaintiff alleges, "National Beverage's share price fell $2.90, or 2.64%, over the following two trading days." *Id.* ¶ 153.

However, Huenfeld and Citrullo both filed their respective lawsuits more than eighteen months *prior to* the publication of the July 3 Article.  *See Huenfeld v. Nat'l Beverage Corp.*, Case No. 1:16-cv-62881-RNS (S.D. Fla. filed Dec. 7, 2016), ECF No. 1; *Citrullo v. Nat'l Beverage Corp.*, Case No. 0:17-cv-60225-WPD (S.D. Fla. filed Jan. 27, 2017), ECF No. 1.  Plaintiff does not allege that any of the allegations referenced within these complaints were not already publicly disclosed when the WSJ published the July 3 Article.[9]  Nor does Plaintiff identify any statement within the July 3 Article that constitutes "new information" sufficient to constitute a corrective disclosure.[10]

---

[9]  Although the complaints in both actions are presently sealed, they were only ordered sealed *after* the publication of the July 3 Article.  *See Huenfeld*, Case No. 1:16-cv-62881-RNS (S.D. Fla. filed Apr. 10, 2019), ECF No. 14 (granting joint motion to seal documents, including complaint, after the "plaintiffs recanted their allegations"); *Citrullo v. Nat'l Beverage Corp.*, Case No. 17-60225-CIV-DIMITROULEAS/Snow, 2018 WL 6620110, at *2 (S.D. Fla.) (recommending granting joint motion to seal documents, including complaint, in part because "the factual and/or implied allegations in the [complaint] . . . have been withdrawn and recanted by the [p]laintiff"), *report and recommendation adopted*, 2018 WL 6620464, at *1 (S.D. Fla. Nov. 2, 2018).

[10]  To the extent Plaintiff argues that Citrullo's statements that he "stands by his allegations 100%" and that Caporella's conduct "was definitely inappropriate" constitutes new information, the Court disagrees because these statements are "merely confirmatory" of already public information.  *See FindWhat*, 658 F.3d at 1311 n.28.

Plaintiff notes that the Eleventh Circuit "has expressed a willingness to countenance 'some lag in the market's processing of public information.'" Resp. at 24 n.13 (internal quotation marks omitted). But the more than eighteen-month gap here is far greater than the relatively narrow leeway envisioned by the Eleventh Circuit, particularly when the disclosed information is completely nonscientific. *See Sapssov*, 608 F. App'x at 863 (citing cases holding that three-month delay between a public disclosure and price drop "did not break the causal chain for loss causation" because the disclosed information was only comprehensible to physicians or other subject matter experts). Moreover, Plaintiff fails to provide any evidence to suggest that the allegations at issue were not public "on the day of" the July 3 Article's publication, "which is the relevant time for our purposes here." *See Meyer*, 710 F.3d at 1198 n.9 (rejecting claim that property appraiser sales lists were private documents when evidence suggested that the lists were publicly available at the time of the alleged corrective disclosure). Nor does Plaintiff provide any evidence that the relevant pleadings were not "easily obtainable" from the Court's docket. *See Sapssov*, 608 F. App'x at 863 (stating that information "that had existed in publicly accessible court dockets" made the information "easily obtainable" and that "the market was able to assimilate the information without the assistance of" a report merely summarizing this information). Accordingly, Plaintiff fails to sufficiently allege that the July 3 Article constitutes a corrective disclosure that "establishes a causal link" to Plaintiff's stock-value loss. *See Sapssov*, 608 F. App'x at 863 (internal citation omitted). Thus, Defendants' Motion to Dismiss the Amended Complaint as to the sexual harassment allegations is GRANTED.

Because Plaintiff fails to sufficiently plead that any material statement or omission by Defendants violated § 10(b), Defendants' Motion to Dismiss Count I of the Amended Complaint is GRANTED.

C.      Violations of § 20(a) (Count Two)

Because Plaintiff fails to state a predicate claim for primary liability under § 10(b), Plaintiff's claim under § 20(a) also fails. *See Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635–36 (11th Cir. 2010) ("[A] primary violation of the of the securities law is an essential element of a § 20(a) derivative claim . . . As the . . . [c]omplaint failed to allege primary liability under § 10(b), there can be no secondary liability under § 20(a).").

Accordingly, Defendants' Motion to Dismiss Count II of the Amended Complaint is GRANTED.

**IV.    CONCLUSION**

UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED and ADJUDGED that Defendants' Motion to Dismiss (ECF Nos. 26) the Amended Class Action Complaint (ECF No. 25) is GRANTED.  The Clerk of Court is instructed to CLOSE this case.  All pending motions, if any, are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this  29th  day of August, 2019.


*K. M. Moore*
K. MICHAEL MOORE
UNITED STATES CHIEF DISTRICT JUDGE

c:      All counsel of record

23